## GORDON v. PADUCAH ICE MFG. CO.
### No. 78.

District Court, W. D. Kentucky,
Paducah Division.

Nov. 15, 1941.

982

John D. Driskill and Albert Karnes, both of Paducah, Ky., for plaintiffs.

Wheeler & Shelbourne, of Paducah, Ky., for defendant.

Gerard D. Reilly, Sol., and Irving J. Levy, Asst. Sol., both of Washington, D. C., and Charles H. Livengood, Jr., Regional Atty., of Nashville, Tenn., for administrator as amicus curiae.

MILLER, District Judge.

This action was filed by the plaintiff Cecil Gordon as an employee of the defendant Paducah Ice Manufacturing Company to recover for himself and for other employees· of the defendant alleged to be similarly situated unpaid wages alleged to be due them under the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 201 et seq., together with liquidated damages and a reasonable attorney's fee. The defendant denies that the plaintiffs were engaged in the production of goods for commerce, and further claims that if they were engaged in the production of goods for commerce they were nevertheless exempt from the provisions of the Act by Section 13 thereof, and that even if they were not exempt they were nevertheless paid the full amount required by Sections 6 and 7 of the Act. The case was heard by the Court without a jury on the single question of liability on the part of the defendant, it being agreed the the question of the amount of liability with respect to each employee, if it was found that liability did exist, would be determined later by supplemental proceedings. The Administrator of the Wage and Hour Division of the United States Department of Labor requested permission to file a

brief as amicus curiae which permission was granted, and such brief has been filed.

## Findings of Fact.

The defendant Paducah Ice Manufacturing Company is a Kentucky corporation with its principal place of business in Paducah, McCracken County, Kentucky, and is engaged in the manufacture and sale of ice, both wholesale and retail. During the strawberry picking season in Western Kentucky it sold large quantities of ice to Fruit Growers Express Company, Railway Express Company and Illinois Central Railroad Company, for the icing of refrigerator cars which carried strawberries from Paducah, Kentucky, to many and distant points in other states. The plaintiffs were employees of the defendant and performed the necessary labor in icing the refrigerator cars, which was a part of defendant's duty, pursuant to its contract with said companies, in connection with its sale of the ice to these companies.

Prior to 1915 there was but a relatively small amount of strawberries grown in McCracken County. In 1915 berry growers organized a co-operative association known as McCracken County Strawberry Growers' Association. Thereafter the growing and shipping of strawberries in McCracken County and nearby counties in Western Kentucky materially increased until it has reached the point where during one season approximately 900 cars were marketed. The chief contributing factor in this development was the investment by the defendant company in the construction of an ice plant and a loading ramp near the Union Station in Paducah on a spur track that connected with the Illinois Central Railroad. This location was not a suitable place for the retail distribution of ice, but was so located for the purpose of facilitating the delivery of strawberries by the growers and the shipment of them in the refrigerator cars referred to. The general practice was to place a refrigerator car on the spur track beside the platform and loading ramp of the defendant. The platform was at a proximate level with the floor of the refrigerator car, while the loading ramp was at a proximate level with the top of the refrigerator car. Several hours before the delivery of the strawberries to the platform the car would be pre-cooled by the icing operation hereinafter described, which would reduce its inside temperature from approximately 80 degrees to approximately 42 degrees. Strawberries would be trucked by the grower from the field to the platform and placed on the platform in crates containing 24 small wooden boxes. After being inspected by the Federal Government the crates of strawberries would be stored in the refrigerator car through the side door. The refrigerator car had compartments at each end known as bumpers which were filled with ice through an opening in the top. This ice was supplied by the defendant by being placed upon the ramp and moved by an employee along the ramp to the position of the bumper to which point the employee would put the ice in the bumper. The ice was in blocks of 300 pounds and after these large blocks had largely filled the bumper compartment other blocks of ice would be broken into small parts and poured into the bumper so as to complete the filling. The defendant employed more than ten employees in the performance of these icing operations but its employees did not in any way handle the loading of the strawberries into the car, which work was performed by employees of the cooperative association. After a car was loaded it would be removed by the Railroad Company to a point nearby where it would be allowed to remain for approximately twelve hours, sometimes longer, during which time the field heat would be removed from the strawberries therein by means of a fan which blew the cold air from the ice over the berries and throughout the car. The car would then be re-iced and transported to its point of destination. In most instances it was necessary for the car to be again iced in another State before it reached its final destination. There were no other cold storage facilities or such icing facilities as were furnished by the defendant, in Western Kentucky, and such car icing facilities so furnished by the defendant were essential to the development of strawberry growing in Western Kentucky. Strawberries could not be successfully shipped by truck except for short distances from the point where picked. The strawberries shipped in the refrigerator cars would be successfully delivered to points as far West as Oregon and as far North as Canada.

The strawberries so shipped were grown on farms in the general vicinity of the defendant's plant in McCracken County, Kentucky, and in adjoining counties in Western Kentucky. Only about a third of the berries were grown within a radius of ten miles of Paducah. After the berries were

picked in the field it was important because of the heat and their perishable nature that they be transported to the defendant's platform as quickly as possible and placed in a pre-cooled refrigerator car. The strawberry season in Western Kentucky extends over a period of about three weeks, beginning sometime between the latter part of April and the latter part of May. It was impossible to determine in advance the exact date when the season would begin and the berries could be picked or when the peak of the season would be reached, as this depended upon weather conditions during the Spring. Because of their perishable nature strawberries must be picked on the day when they mature into ripeness, which day can not be accurately determined in advance. In the year 1940 the strawberry picking season in Western Kentucky opened about May 20, 1940 and extended through about June 8, 1940.

The plaintiff Cecil Gordon was employed by the defendant on May 22, 1940, for the purpose of icing the refrigerator cars. He worked in this capacity through June 6, 1940. Other plaintiffs were likewise employed by the defendant during approximately the same period of time. Other men, who are not made parties to this action, were also employed by the defendant for this same purpose during the continuance of the strawberry picking season. At the start of the season the defendant gave out the information that it would employ men for the purpose of icing refrigerator cars. Many men applied for the employment. The defendant was not able to use all of the applicants and adopted the system of dividing the work, as there became need for such employment, among those men who were present and available. The work over a 24-hour period was divided into two shifts, one beginning at 6:00 a. m. and running through 6:00 p. m. and the other beginning at 6:00 p. m. and running through 6:00 a. m. If a refrigerator car was in the process of being iced when the shift would ordinarily terminate the men so employed at the time would continue with their work until the particular car was completely serviced. The foreman of the respective shifts would go on the job at 6:00 a. m. and 6:00 p. m. respectively, and as refrigerator cars were "spotted" by the Railroad Company beside the platform for the purpose of being pre-cooled or iced the foreman would select from those men present and wanting to work the number of men required to perform the work. When any man was employed he was required to sign a Workmen's Compensation card. When the icing of any particular car was completed the men employed in doing that work were released from further immediate labor by the defendant, but they would remain in the immediate vicinity of the platform available for work when and if another refrigerator car was spotted by the Railroad Company. The interval between the time when one car would be removed after being completely iced and another car would be spotted to take its place varied from about 15 minutes to two hours or more. The defendant company was unable to tell how long this period would be and usually received information from the Railroad Company regarding the spotting of a car just shortly before its arrival. The foreman told the men applying for this work that if they wanted the work it would be necessary for them to be present and available when a refrigerator car was spotted, and if a man was not present when the work began he was of course not put upon that particular job and another man assigned to the place. The man who would otherwise have obtained the work thus lost the opportunity to work but was not fined or disciplined in any way for not being present nor prevented from receiving employment at a later time when he was present. Neither the foreman, nor any employee of the defendant, exercised any supervision or control over the men while they were not actually working and did not direct their activities during the times when there were no cars available for icing. During such periods the men would sit around in the near vicinity loafing and waiting for possible work when the next refrigerator car was spotted. At times some of them would go to a nearby restaurant for food. After the season got under way there arose a complaint among some of the men that they were not getting enough work and a desire was expressed by these men that they receive work of about 8 hours per day. The foreman called a meeting of the men and advised them that the Company did not have enough work available to employ all of them 8 hours a day and could only divide the available work among all those applying for the same, unless they could arrange among themselves some plan by which certain of the men would be present at certain hours and others would be present at different hours, during which periods of time the ones so present would divide the work available. This suggestion by the foreman did not meet with general approval and the

men proceeded with the existing practice of being present and taking their chances of receiving work when a car was spotted, with those not wishing to take this chance leaving the ranks of those available for work. The men who worked on icing refrigerator cars were paid at the rate of 30 cents per hour for the time actually engaged in icing the cars, but were not paid for the waiting time between the departure of one car and the arrival of another.

### Conclusions of Law.

Section 6 of the Fair Labor Standards Act, Section 206, Title 29 U.S.C.A., provides that every employer shall pay to each of his employees who is engaged in commerce or in the production of goods for commerce wages at the rate of not less than 25 cents an hour during the first year from the effective date of the Act and at the rate of not less than 30 cents per hour during the next six years from such date. Section 7 of the Act, Section 207, Title 29 U.S.C.A., provides that no employer shall, except as otherwise provided in that Section, employ any of his employees who is engaged in commerce or in the production of goods for commerce for a workweek longer than 44 hours during the first year from the effective date of the Act, or for a workweek longer than 42 hours during the second year from such date, unless such employee receives compensation for his employment in excess of the hours so specified at a rate not less than one and one-half times the regular rate at which he is employed. The effective date of the Act was October 24, 1938.

The defendant pleads as its first defense that the Court lacks jurisdiction because the amount in controversy is less than $3,000 exclusive of interest and costs, as is required by Section 41(1), Title 28 U.S.C.A. However, Section 41(8), Title 28 U.S.C.A., gives the District Court original jurisdiction of all suits and proceedings arising under any law regulating commerce. It has been repeatedly held that this provision confers jurisdiction regardless of the amount involved. The present proceeding is one arising under a law regulating commerce, and accordingly jurisdiction exists irrespective of the amount involved. See Stucker v. Roselle, D.C.W.D.Ky., 37 F. Supp. 864, and authorities therein cited.

The defendant pleads as a second defense that the complaint fails to state a cause of action against it. With respect to the plaintiffs specifically named in the complaint this point will be discussed later. With respect to other employees of the defendant who the complaint alleges are similarly situated, but who are not named in the complaint, the Court is of the opinion that no cause of action is presented by the record in its present form against the defendant. The Court has heretofore given careful consideration to Section 16(b) of the Act, Section 216(b), Title 29 U.S.C.A., which gives the right to one or more employees to sue in behalf of himself or themselves and other employees similarly situated, and has held that the prosecution of such a class action, although permissible under the terms of the statute, yet should be prosecuted only on behalf of those who show by the record that they are participating in the suit and are willing to be bound by the final judgment. Shain v. Armour & Co., D.C.W.D.Ky., 40 F.Supp. 488.

Defendant contends with respect to the complaint generally that the plaintiffs named therein were not engaged in commerce or in the production of goods for commerce, as is required by the Act, pointing out that the sale and delivery of the ice to the carrier was a sale and delivery to the ultimate consumer thereof, and entirely local in its character. I do not agree with this contention. The fact that goods are sold and delivered entirely within one State does not prevent the sale from being a part of interstate commerce. Where goods or commodities are bought for use beyond state lines and it is understood by both the seller and the purchaser that they are to be promptly transported by the purchaser in interstate commerce, the sale of such goods or commodities is in itself a part of interstate commerce. Swift & Co. v. United States, 196 U.S. 375, 25 S.Ct. 276, 49 L.Ed. 518; Dahnke-Walker Milling Co. v. Bondurant, 257 U.S. 282, 290, 42 S.Ct. 106, 66 L. Ed. 239; Lemke v. Farmers' Grain Co., 258 U.S. 50, 54, 42 S.Ct. 244, 66 L.Ed. 458; Stafford v. Wallace, 258 U.S. 495, 42 S.Ct. 397, 66 L.Ed. 735, 23 A.L.R. 229; United States v. Rock Royal Co-Op., 307 U.S. 533, 568, 59 S.Ct. 993, 83 L.Ed. 1446; Currin v. Wallace, 306 U.S. 1, 59 S.Ct. 379, 83 L.Ed. 441; Mulford v. Smith, 307 U.S. 38, 59 S. Ct. 648, 83 L.Ed. 1092; North Western Improvement Co. v. Ickes, 8 Cir., 111 F.2d 221. In the present case there is the additional fact that the sale is not an isolated transaction but is accompanied by other acts on the part of the defendant that make it an in-

tegral part of the transportation of the berries. Defendant relies in part upon a ruling by this Court in Bagby v. Cleveland Wrecking Co., D.C., 28 F.Supp. 271. The ruling in that case was directed solely to the sufficiency of the allegations of the complaint and pointed out that the complaint did not allege that the plaintiff employees were engaged in commerce or in the production of goods for commerce, nor did it state any facts which could be reasonably interpreted as constituting the production of goods for commerce. The complaint in the present action specifically states that the plaintiff was engaged in commerce and the production of goods for commerce. There is the further distinguishing fact that in the Bagby case the plaintiffs merely cleaned brick and salvage from demolished structures without there being any showing that such materials were intended for transportation to another state or would actually enter such commerce except as a part of a later and entirely unrelated transaction. See Schechter Poultry Corp. v. United States, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570, 97 A.L.R. 947. Defendant also contends that under the definition of the word "goods" as contained in Paragraph 3(i) of the Act, Section 203(i), Title 29 U.S.C.A., the sales of ice did not constitute sales of "goods". This paragraph defines the term "goods" as meaning goods, wares, products, commodities or merchandise, but not including "goods after their delivery into the actual physical possession of the ultimate consumer thereof other than a producer, manufacturer, or processor thereof." But this construction of the Act fails to give proper weight to the use of the word "after." The statute says that the term "goods" does not include "goods *after* their delivery" into the possession of the ultimate consumer. This obviously can not refer to goods which are being produced for commerce, because the production of goods for commerce is necessarily prior to their delivery to a consumer. This Section of the Act was evidently intended for the purpose of protecting a purchaser from liability under Section 15(a)(1) of the Act, which makes it unlawful for anyone to transport or ship in commerce any goods in the production of which any employee was employed in violation of Sections 6 or 7 of the Act. See Fleming, Administrator, v. Atlantic Company, D.C., 40 F.Supp. 654.

Defendant contends that since the plaintiffs were paid at the rate of 30 cents an hour for the entire time in which they were actually engaged in icing refrigerator cars, and since the evidence fails to show that any employee was so engaged for more than 42 hours in any one workweek, the plaintiffs have been paid in full, even under the provisions of the Act. This contention is correct if the waiting time between the icing of successive cars is not included in the hours of labor. If such waiting time is included, the workweek, consisting of 12 hours per day, exceeds the 42 hour maximum. Plaintiffs rely upon the decisions in Missouri, K. & T. R. Co. v. United States, 231 U.S. 112, 34 S.Ct. 26, 58 L.Ed. 144; United States v. Southern Pacific Co., 9 Cir., 245 F. 722; Chicago, R. I. & P. R. Co. v. United States, 8 Cir., 253 F. 555, and other similar decisions, in which it was held that waiting time under the conditions existing therein should be included within the hours of service. But those cases specifically point out that although the men were waiting and doing nothing they were under orders, liable to be called upon at any moment and not at liberty to go away. As was said in Missouri, K. & T. R. Co. v. United States, supra [231 U.S. 112, 34 S.Ct. 27, 58 L.Ed. 144], "they were none the less on duty when inactive. Their duty was to stand and wait." The brief of the Administrator, in relying upon these cases, proceeds upon the assumption that the plaintiffs in the present case were required to be on hand at all times, regardless of the length of time it might be before the arrival of the next car. If such were the facts in this case the Administrator's contention would probably be sound, but as has been indicated in the Findings of Fact hereinabove, the situation with respect to these employees was entirely different. They were free to report or not to report as they saw fit; to leave at any time they wished without discrimination if they later decided to return for any work which was available. Although they did stand and wait, yet there was no duty upon them to do so. It seems to the Court that it was simply a case of there being many more applicants for the available work than was needed; and an effort on the part of the defendant to distribute the work fairly evenly among those who needed it and were willing to be present when their services could be used. The situation is essentially different from the facts in the case of Travis v. Ray, D.C., 41 F.Supp. 6, recently decided by this Court and in which the Court held that waiting time should be included within the hours of labor. Ac-

·cordingly, I hold as a matter of law that the waiting time in the present case should not be included within the hours of labor in any particular workweek under consideration.

The foregoing ruling in all probability disposes of this action adversely to the claims of the plaintiffs. But inasmuch as the defendant has pleaded certain exemptions from the provisions of the Act a ruling should be made on the matters presented by these pleas, to take care of the possible contingency of it being later developed that the hours of labor as hereinabove defined exceeded the 42 hour maximum. Defendant contends that it is exempt from the provisions of overtime employment by virtue of Section 7(c) which provides that the Act is not applicable in the case of the employer engaged in the first processing of perishable or seasonal fresh fruits during a period of not more than 14 workweeks in the aggregate in any calendar year. It is contended by the Administrator that the icing of the refrigerator cars did not constitute the first processing of the fresh strawberries. In Interpretative Bulletin No. 14, issued in June, 1940, the Administrator in dealing with the question of first processing of milk, whey, skimmed milk or cream into dairy products ruled that processing connoted a chance in the form of the raw material such as the making of cooled and pasteurized milk, condensed milk, evaporated milk and clabber. He ruled that the making of malted milk or ice-cream did not constitute a first processing of milk since their manufacture involved the use of ingredients other than milk. In the same Bulletin, in dealing with the first processing of perishable or seasonal fresh fruits, he ruled that the following operations constituted first processing and fall within the exemption, namely, drying, freezing, preserving (for example, cucumbers or cherries in brine), picking or canning, and the stemming of strawberries.

▬▬▬ The Supreme Court has stated that the Administrator's interpretations of a new statute are entitled to great weight because they involve the contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion and of making the parts work efficiently and smoothly while they are still untried and new. United States v. American Trucking Ass'ns, 310 U.S. 534, 539, 60 S.Ct. 1059, 84 L.Ed. 1345. See also United States v. Darby, 312 U.S. 100, p. 118, 61 S.Ct. 451, page 459, 85 L.Ed.

609, 132 A.L.R. 1430, Note 2. Icing and cooling are but a different degree of freezing and in any event would seem to fall within the general meaning of the term preserving when applied to the icing of strawberries for the purpose of transporting them into distant states and preserving them while in the course of such transportation. It may be true that the defendant's employees at no time actually handled the strawberries, but, as pointed out above, the icing of the cars in question are not to be considered as merely isolated acts on the part of the defendant. The evidence clearly showed that they were essential and integral parts of the marketing of the strawberries in distant states. The operations of the defendant accordingly fall within the exemption provided by Section 7(c) of the Act.

▬▬▬ The defendant further contends that its operations are exempt by reason of Section 13(a)(10) of the Act, Section 213 (a)(10), Title 29 U.S.C.A. This Section provides that the provisions of Sections 6 and 7 of the Act shall not apply with respect "to any individual employed within the area of production (as defined by the Administrator), engaged in handling, packing, storing, ginning, compressing, pasteurizing, drying, preparing in their raw or natural state, or canning of agricultural or horticultural commodities for market, or in making cheese or butter or other dairy products." Interpretative Bulletin No. 14 again furnishes a good guide to the proper construction of this Section of the Act. It states that the legislative history of this Section indicates that the term "agricultural or horticultural commodities," as used in the Section, means those commodities as they come from the farm and before any change has been effected in their natural form. The term "handling" is defined as those physical operations customarily performed in obtaining agricultural or horticultural commodities from producers' farms, transporting them to and receiving them at the establishment, weighing them or otherwise determining on what basis the producer is to be paid, placing them in the establishment where further operations are to be performed, and delivering the commodities to warehouses. The term "storing" is defined as placing agricultural or horticultural commodities in storage rooms or other places where the commodities are to be held prior to further preparation, sale or shipment, or the taking care of the commodities while

988

they are being so held. Under the foregoing definitions, the strawberries in question would appear to be included within the term agricultural or horticultural commodities, but the defendant's activities in icing the refrigerator cars do not come within the meaning of either the term handling or the term storing. However, the defendant claims that its operations are included within the phrase "preparing in their raw or natural state." This term is defined in Interpretative Bulletin No. 14 with respect to fruits and vegetables as cleaning, washing, polishing, grading, sizing, sorting, handpicking, coloring, cooling, and wrapping. The operations in question would seem to constitute a cooling of the strawberries and accordingly come within the term "preparing in their raw or natural state." But the activities in order to be exempt must be within the area of production, as defined by the Administrator. The Administrator's definition, as presently revised, is that an employee is employed within the area of production if he performs the operations enumerated in Section 13(a)(10) on materials all of which come from farms in the general vicinity of the establishment where he is employed, *and* the number of employees engaged in the establishment in those operations does not exceed ten. In the present case the strawberries come from farms in the general vicinity of the establishment where the plaintiffs are employed, but the number of employees engaged in the icing operations exceeds ten. Accordingly, if the Administrator's definition is to be controlling the operations in question do not fall within the exemption of Section 13(a)(10). Defendant contends that the Administrator arbitrarily exceeded his authority in including in his definition the fact that employees must not exceed ten, pointing out that a proper definition should be limited to a geographical consideration of the area involved. I recognize the generally accepted principle of administrative law that authority delegated to an administrative board can not be exercised arbitrarily or in a way which has no reasonable relation to the question involved. See Douglas v. Noble, 261 U.S. 165, 168, 43 S. Ct. 303, 67 L.Ed. 590. However, the record in its present shape throws no light upon the history or origin of the Administrator's definition, nor does it disclose what facts were considered by the Administrator in giving this definition. I believe that it is to be presumed that the Administrator has exercised his delegated authority in a rea-

sonable and proper manner until it be shown to the contrary by those attacking the validity of the regulation in question. Accordingly, in the state of the present record, I am not prepared to hold that the definition of the area of production is invalid. The defendant's operations are not exempt under Section 13(a)(10) of the Act.

Time will be given to the plaintiffs to complete the record, if they so wish, by depositions or by stipulation, with respect to the actual hours of work and pay received by the plaintiffs named in the complaint, following which judgment will be prepared and tendered by defendant's counsel dismissing the petition.