### CHAPMAN et al. v. HOME ICE CO.
### No. 254.

District Court, W. D. Tennessee, W. D.
Jan. 27, 1942.

Anthony Aspero, of Memphis, Tenn., for plaintiff.

Julian C. Wilson and Bertrand W. Cohn, both of Memphis, Tenn., for defendant.

BOYD, District Judge.

This case is filed as a class action under the Fair Labor Standards Act of June 25, 1938, c. 676, 52 Stat. 1060, 29 U.S.C.A. § 201 et seq. The plaintiffs are entitled to recover in varying amounts for a period of time between April 17, 1939, and November 22, 1940, if they were engaged in commerce, or in the production of goods for commerce within the meaning of the Act.

The defendant has, since April 17, 1939, operated a number of ice plants in the City of Memphis, manufacturing ice which is sold and delivered in Memphis, and Shelby County, Tennessee.

During the time covered by this law suit, approximately nineteen months, the company has manufactured and sold 121,-846 tons of ice.

Ice is sold and delivered from defendant's platforms at retail and fifteen to twenty per cent of its total production, designated by it as "wholesale business" is sold to peddlers who resell same over various routes in the City of Memphis. In addition to these sales, the defendant, during the period in question, has sold to railroad companies 1,404 tons of ice, or 1.15% of the total amount manufactured, which defendant placed, in crushed form, in refrigerator cars for the purpose of preserving shipments of perishable commodities to other states. 2,605 tons, or 2.13% of the defendant's total output went to railroad companies to cool passenger cars which crossed state lines. 4,283 tons of the defendant's product, or 3.51% of its total output, was delivered for the purpose of car refrigeration to Memphis merchants, who shipped in interstate commerce dressed poultry, meats and fruits. This total of 6.79% of ice manufactured by the defendant with which we are mainly concerned in this case includes approximately 2% of so-called "white ice" which is not ordinarily merchantable ice, but ice which can be and is used by the defendant in car icing operations. It may be termed a by-product, or ice that the defendant

does not intend to make but which, nevertheless, comes out in the process.

The plaintiffs, under the proof, were engaged in the manufacture of ice in its various steps, and claim coverage under the Act because, as they say, this making and delivery of ice to the railroads and others who use same in the refrigeration of cars, put them "in commerce or in the production of goods for commerce." The proof shows in connection with these particular operations that the ice was manufactured, sold, delivered and paid for in Memphis, Tennessee, and defendant, therefore, claims this particular phase of its business is local in nature, and an activity which is not covered by Sections 6 and 7 of the Fair Labor Standards Act.

Section 6 of the Act requires every employer to pay each of his employees who is engaged "in commerce or in the production of goods for commerce" wages at certain rates.

Section 7 of the Act provides that no employer shall employ any of his employees who is engaged "in commerce or in the production of goods for commerce" for more than a certain number of hours during a workweek, and for compensation at a rate of not less than one and one-half times the regular rate for employment in excess of the hours specified.

Plaintiffs claim coverage under the Act even though the activities in question are considered as wholly intrastate in character. They say in this connection, the manufacture and delivery of ice to the railroads and others for the purpose of preserving perishable commodities in interstate shipments is commingled with and is a burden on interstate commerce and is regulated under the Act. More particularly, they say they are entitled to the benefits if it affects, facilitates, or is a part of "transportation" in commerce. The Act defines commerce as follows:

"Sec. 3 [§ 203.] * * * (b) 'Commerce' means trade, commerce, transportation, transmission, or communication among the several States or from any State to any place outside thereof."

It is contended on behalf of the defendant, not only that plaintiffs are not engaged "in commerce or in the production of goods for commerce" within the meaning of the Act, but that we are not dealing with an article, the trade or commerce

in which, is included under the Act. In this connection, the defendant insists the Court should give effect to the definition of the word "goods" as set out in the Act, which would exclude the particular commodity (ice) in question from the provisions of the Act. "Goods" is defined in Section 3(i) of the Act as follows:

"As used in this Act [sections 201–219 of this title] * * * 'goods' means goods (including ships and marine equipment), wares, products, commodities, merchandise, or articles or subjects of commerce of any character, or any part or ingredient thereof, but does not include goods after their delivery into the actual physical possession of the ultimate consumer thereof other than a producer, manufacturer, or processor thereof."

In other words, defendant says the ice involved here had been delivered into the actual physical possession of the ultimate consumers, who were not producers, manufacturers or processors thereof, and, therefore, the goods (ice) so delivered was no longer subject to be dealt with under the Act.

Further, defendant contends Congress has not legislated in this instance to protect interstate commerce, by regulating intrastate matters which may be commingled with or are a burden on or affect interstate commerce, as defined in the Act.

To determine the question, it will be necessary to consider the meaning and scope of the phrase "in commerce or in the production of goods for commerce" employed in Sections 6 and 7 of the Act, and the intent of Congress with respect to the use of these words.

Putting plain, everyday construction on the language employed, and there is no ambiguity which makes it necessary to refer to the purpose clause of the Act or its legislative history, I am constrained to the view that we are dealing in this case with an act which deals with things or commodities only, which are subject to trade and traffic in the business world, and the employees' connection with the production of same. The words "for commerce" clearly are employed in this restricted sense. The Supreme Court in the case of United States v. Darby Lumber Co., 312 U.S. 100, 61 S.Ct. 451, 457, 85 L.Ed. 609, 132 A.L.R. 1430, speaks of shipments of goods and commodities, distribution of goods, and competition in the sale of goods, etc. It was said in that case:

"The motive and purpose of the present regulation are plainly to make effective the Congressional conception of public policy that interstate commerce should not be made the instrument of competition in the distribution of goods produced under substandard labor conditions, which competition is injurious to the commerce and to the states from and to which the commerce flows. The motive and purpose of a regulation of interstate commerce are matters for the legislative judgment upon the exercise of which the Constitution places no restriction and over which the courts are given no control. McCray v. United States, 195 U.S. 27, 24 S.Ct. 769, 49 L.Ed. 78, 1 Ann.Cas. 561; Sonzinsky v. United States, 300 U.S. 506, 513, 57 S.Ct. 554, 555, 81 L.Ed. 772, and cases cited."

We are not dealing with interstate commerce in its broad sense, but rather in a limited way under a particular act. Congress did not see fit to fix the coverage too broadly. It seems to have given consideration to those things which are reserved to the states under the Constitution. It might have used the phrase "affecting commerce" as in the National Labor Relations Act, Act of July 5, 1935, 29 U.S.C.A. § 151, had it not intended there should be a definite line drawn. The coverage here is limited to those employees who are engaged "in commerce" per se, or are engaged in the production and handling of goods and merchandise intended for sale and distribution in the business world across state lines. The Labor Relations Act empowered the Labor Board to prevent unfair labor practices "affecting" commerce, not "in commerce," and not "in the production of goods for commerce."

The Fair Labor Standards Act does not deal with all goods or goods generally and, of course, Congress had no power to do so, but only those goods produced which it is intended will move into interstate commerce. United States v. Darby, supra. There could be no competition in the sale of this ice in other states and no restriction on the free flow of it among the states as it is wholly consumed in its use.

Had Congress considered the activity in question here a burden on interstate commerce, or that it was so commingled with it as to be a part of it, it had the right and power to regulate same; that is, provided it did not involve transactions

which would be classed as having only an indirect or remote bearing on interstate commerce, but it did not see fit to do so.

■ Here the words "production for commerce," denotes an intention to deal in a restricted way with the question of coverage in connection with those employed directly in the production of articles to be sold, shipped or transported across state lines "in commerce." Producing goods "for" a certain purpose naturally infers a direct relation, while producing something which only "affects" a certain purpose implies an indirect relation. For legislative history on intended coverage of the Act, see Jewel Tea Co. v. Williams et al., 10 Cir., 118 F.2d 202, note #5; Fleming, Adm'r, v. A. B. Kirschbaum Co., 3 Cir., 124 F.2d 567, decided December 17, 1941.

■ There is no question but that the icing of cars to preserve interstate shipments "affects" the transportation of perishables. Indeed, there could be no shipments of this class of merchandise unless ice is used, but we are not dealing with coverage on so great a scale. We cannot add to the Act and make it cover broadly those things which "affect" commerce. We take the Act as we find it.

The particular operation in question cannot be coupled with the transportation feature of the definition of commerce as set out in the Act to afford coverage here, as was done in Fleming v. Atlantic Co., D.C., 40 F.Supp. 654, 661. The Court there, giving the words of coverage under consideration their broadest possible meanings, in effect held the manufacture and delivery of ice for the icing of cars "affected" transportation, and employees were, therefore, engaged "in the production of goods for transportation or commerce." It limited the application no doubt to the transportation feature in the definition of "commerce" realizing ice, as in this case, was not an article of commerce among the states. The Court evidently did not take into consideration, in so doing, those things which affect transportation or commerce in an indirect way. This was required, as will be seen. He defines the word "for," and giving it its broadest dictionary meanings as "in view of" or "to serve as a part of," holds "ice produced * .* * 'in view of, or to serve as a part of * * * transportation,'" is the reasonable construction of the coverage words in the Act. He thus gives the same effect to words "for com-

merce" as that which had been determined under acts with broader coverage where the words used were "affecting commerce." Gerdert et al. v. Certified Poultry & Egg Co., Inc., et al., D.C., 38 F.Supp. 964, 969. The Court in this case said:

"It would seem, therefore, that decisions on the Anti-Trust Statute, the Cotton Control Act, Tobacco Control Act, Warehouse Act, and National Labor Relations Act, furnish little guide to the Court in the consideration of the question of whether a wholesaler, who is not producing goods for commerce, who is not selling goods in interstate commerce, and who is not selling goods with knowledge that shipment in interstate commerce is intended, and who is not operating under an Act of Congress regulating practices that affect interstate commerce, is, or is not, engaged in interstate commerce. The Court definitely concludes that the Fair Labor Standards Act does not attempt to regulate local transactions which merely *affect* interstate commerce except in the matter of production of goods for commerce or the sale of goods to be shipped, sold, and delivered in commerce, or intended to be shipped, sold, or delivered in interstate commerce."

Also, see Muldowney v. Seaberg Elevator Co., D.C., 39 F.Supp. 275; Fleming v. Arsenal Bldg. Corp. et al., D.C., 38 F.Supp. 207; Robinson v. Massachusetts Mutual Life Ins. Co., Tenn., Nov. 29, 1941, 158 S. W.2d 441.

Again I say, we must not lose sight of the fact that we have for consideration here the usual and ordinary meaning of words, and it is unreasonable and a strained construction of the language used, to say Congress intended coverage on so broad a scale.

■ Referring to the definition of commerce as set out in the Act, and really it is not necessary to go further, it cannot be said that the plaintiffs' handling of the ice in question was trade, commerce, transportation, transmission or communication among the several states, or from any state to any place outside thereof. We need but give the words used in the definition of "commerce" their usual, everyday, and generally accepted meanings.

■■ To say the manufacture and delivery of ice to railroads for refrigeration purposes makes it a part of transportation or an aid to transportation, or an activity which affects transportation, and thus com-

merce, as was done in Fleming v. Atlantic Co., supra, would take in a very small part of this defendant's business. As stated, defendant disposed of only 1.15% of its total output in this manner and for this purpose. It should not be said, however, because the comparatively small part of the defendant's output went into interstate commerce that it was inconsequential and should not be noticed. It is recognized under the authorities, as stated in United States v. Darby Lumber Co., supra, that in present day industry competition by a small part may affect the whole, and that the total effect of competition of many small producers may be great. The legislation aimed at a whole, embraces all of its parts. National Labor Relations Board v. Fainblatt, 306 U.S. 601, 307 U.S. 609, 59 S.Ct. 668, 83 L.Ed. 1014; Santa Cruz Fruit Packing Co. v. National Labor Relations Board, 303 U.S. 453, 58 S.Ct. 656, 82 L.Ed. 954.

▆ Here, at most, the manufacture and delivery of ice in cars would "affect" commerce, or more particularly transportation, in no substantial or direct way, and Congress has not attempted to regulate this strictly intrastate activity as one "affecting" commerce. Santa Cruz Fruit Packing Co. v. National Labor Relations Board, supra; National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352; National Labor Relations Board v. Fainblatt, supra. Nor has Congress by the language of the Act attempted here the regulation of intrastate transactions which are so commingled with or related to interstate commerce that they must be regulated if the interstate commerce is to be effectively controlled, as was said in the Shreveport case (Houston, E. & W. T. R. Co. v. United States), 234 U.S. 342, 34 S.Ct. 833, 58 L.Ed. 1341; Railroad Commission of Wisconsin v. Chicago B. & Q. R. Co., 257 U.S. 563, 42 S.Ct. 232, 66 L.Ed. 371, 22 A.L.R. 1086; Currin v. Wallace, 306 U.S. 1, 59 S.Ct. 379, 83 L.Ed. 441.

To give the phrase engaged "in commerce or in the production of goods for commerce" the broad meaning contended for here by the plaintiffs would put people in interstate commerce who aid in producing anything at all for the railroads, or who work on goods which are sold to the railroads or other common carriers. Certainly Congress did not intend to bring employees under the Act who participate in the manufacture and delivery to railroads of the thousand articles used by them in the operation of their trains. Producing goods which will be sold and delivered to railroads to aid them in transporting goods is producing goods neither "for transportation" nor "for commerce," but to be sold to a carrier as an incidental factor in the operation of its transportation business. Taking this view, this ice was produced neither for "transportation" nor for the broader field of "commerce."

▆ If we are to preserve the identity of the state with reference to commerce, the line must be drawn as it was by the draftsman of this Act, and those things which only indirectly or remotely affect commerce must be considered and recognized as such. Congress has broad powers with reference to commerce and the right to regulate strictly intrastate or local activities under certain conditions, but in doing so it cannot violate the Tenth Amendment to the Constitution which reserves to the states the power to regulate internal commerce, and it has not attempted to do so in the Act now under consideration. Congress has not sought here to invade the province of the states in the regulation of wages and hours under the Fair Labor Standards Act so as to take in indiscriminately local activities of the people in the production and sale of ice.

The following from the case of Schechter Poultry Corp. v. United States, 295 U.S. 495, 546, 55 S.Ct. 837, 850, 79 L.Ed. 1570, 97 A.L.R. 947, seems particularly in point:

"In determining how far the federal government may go in controlling intrastate transactions upon the ground that they 'affect' interstate commerce, there is a necessary and well-established distinction between direct and indirect effects. The precise line can be drawn only as individual cases arise, but the distinction is clear in principle. Direct effects are illustrated by the railroad cases we have cited, as, e. g., the effect of failure to use prescribed safety appliances on railroads which are the highways of both interstate and intrastate commerce, injury to an employee engaged in interstate transportation by the negligence of an employee engaged in an intrastate movement, the fixing of rates for intrastate transportation which unjustly discriminate against interstate commerce. But where the effect of *intrastate transactions upon interstate commerce is merely*

*indirect, such transactions remain within the domain of state power.* If the commerce clause were construed to reach all enterprises and transactions which could be said to have an indirect effect upon interstate commerce, the federal authority would embrace practically all the activities of the people, and the authority of the state over its domestic concerns would exist only by sufferance of the federal government. Indeed, on such a theory, even the development of the state's commercial facilities would be subject to federal control. As we said in Simpson v. Shepard (Minnesota Rate Cases), 230 U.S. 352, 410, 33 S. Ct. 729, 745, 57 L.Ed. 1511, 48 L.R.A.,N.S., 1151, Ann.Cas. 1916A, 18: 'In the intimacy of commercial relations, much that is done in the superintendence of local matters may have an indirect bearing upon interstate commerce. The development of local resources and the extension of local facilities may have a very important effect upon communities less favored, and to an appreciable degree alter the course of trade. The freedom of local trade may stimulate interstate commerce, while restrictive measures within the police power of the state, enacted exclusively with respect to internal business, as distinguished from interstate traffic, may in their reflex or indirect influence diminish the latter and reduce the volume of articles transported into or out of the State.' See, also, Kidd v. Pearson, 128 U.S. 1, 21, 9 S.Ct. 6, 32 L.Ed. 346; Heisler v. Thomas Colliery Co., 260 U.S. 245, 259, 260, 43 S.Ct. 83, 67 L.Ed. 237.

\* \* \* \* \*

"Our growth and development have called for wide use of the commerce power of the federal government in its control over the expanded activities of interstate commerce and in protecting that commerce from burdens, interferences, and conspiracies to restrain and monopolize it. But the authority of the federal government may not be pushed to such an extreme as to destroy the distinction, which the commerce clause itself establishes, between commerce 'among the several States' and the internal concerns of a state."

These distinctions were made and illuminating discussions are found also in the cases of National Labor Relations Board v. Jones & Laughlin Steel Corp., supra; Santa Cruz Fruit Packing Co. v. National Labor Relations Board, supra.; and United States v. Wrightwood Dairy Co., 7 Cir., 123 F.2d 100.

The Court in the Santa Cruz case [303 U.S. 453, 58 S.Ct. 660, 82 L.Ed. 954] said: "Where federal control is sought to be exercised over activities which separately considered are intrastate, it must appear that there is a close and substantial relation to interstate commerce in order to justify the federal intervention for its protection. However difficult in application, this principle is essential to the maintenance of our constitutional system. The subject of federal power is still 'commerce,' and not all commerce but commerce with foreign nations and among the several states. The expansion of enterprise has vastly increased the interests of interstate commerce, but the constitutional differentiation still obtains. Schechter Poultry Corp. v. United States, 295 U.S. 495, 546, 55 S.Ct. 837, 850, 79 L.Ed. 1570, 97 A.L.R. 947. 'Activities local in their immediacy do not become interstate and national because of distant repercussions.' Id., 295 U.S. 495, at page 554, 55 S.Ct. 837, 853, 79 L.Ed. 1570, 97 A.L.R. 947. To express this essential distinction, 'direct' has been contrasted with 'indirect,' and what is 'remote' or 'distant' with what is 'close and substantial.' Whatever terminology is used, the criterion is necessarily one of degree and must be so defined," etc.

Though it is not necessary to the decision here reached, I cannot but give effect to the definition of goods as plainly set out in the Act so as to make it apply to the Act as a whole. The language of the Act directs it, and when read and applied to the facts here, it is clear that Congress intended that ice delivered into the possession of railroads, and packers who use same as the ultimate consumer, is excepted from the coverage provisions of the Act, and is not a commodity or goods which it is intended should be dealt with under the Act. Here again Congress evidently gave consideration to transactions which are local in nature and which only affect commerce indirectly. There is nothing in the Act and no reasonable rule of construction which would limit the application of the definition of "goods" to Section 15 of the Act, which makes it a criminal offense to sell, ship or deliver goods produced in violation of Sections 6 and 7, as the Court so narrowly limited it in Fleming v. Atlantic Co., supra.

Taking this view, the Act reads as follows: "Every employer shall pay to each of his employees who is engaged in com-

merce or in the production of 'goods' for commerce wages, but not including 'goods' which go into commerce after their delivery into the actual physical possession of the ultimate consumer."

The Act as a whole is thus given effect and local activities such as the manufacture and delivery of ice as in this case are thereby excluded from the Act, and persons who worked on same in the first instance are not producers of ice "for commerce."

In Dahnke-Walker Milling Co. v. Bondurant, 257 U.S. 282, 42 S.Ct. 106, 108, 66 L.Ed. 239, it is said: "Commerce * * * comprehends all commercial intercourse between different states and all the component parts of that intercourse. * * * On the same principle, where goods are purchased in one state for transportation to another, the commerce includes the purchase quite as much as it does the transportation."

The Court was dealing broadly with interstate commerce in this case and not with an act of limited coverage and one which defined "goods" in a restricted sense. Currin v. Wallace, 306 U.S. 1, 59 S.Ct. 379, 83 L.Ed. 441, and other cases cited are not in point for the same reason. Santa Cruz Fruit Packing Co. v. National Labor Relations Board, supra, and National Labor Relations Board v. Fainblatt, supra, are not applicable here insofar as they hold interstate character of transaction is not affected by arrangements between seller and purchaser with respect to the place of taking title. The Act here excludes title, and goods are not involved under the Act except insofar as they become the subject of interstate commerce.

In the language used, it was intended to cover first of all, only employees who work directly "in commerce" or "in the production of goods for commerce," that is, on goods or articles which are capable of being traded or sold across state lines, in the business world and in competition with other articles. It was not intended that the Act, for purposes of coverage should apply to goods, merchandise or commodities after same are in the hands of the ultimate consumer. It was not the intention of Congress to broadly cover employees who merely work on or produce articles, the manufacture and delivery of which locally might in some indirect or remote way "affect" interstate commerce.

All things considered, I am of the opinion the production and delivery of ice as shown in this case does not come within the terms and intent of the Act, and plaintiffs are not covered, and are not entitled to recover.

It will not be necessary to notice other questions raised in the case. The complaint is dismissed at the plaintiffs' costs.