**HAMLET ICE CO., Inc., v. FLEMING, Administrator of Wage and Hour Division, United States Department of Labor.**

No. 4908.

Circuit Court of Appeals, Fourth Circuit.
April 13, 1942.

L. R. Varser, of Lumberton, N. C. (J. L. Emanuel, of Raleigh, N. C., Varser, McIntyre & Henry, of Lumberton, N. C., and Pou & Emanuel, of Raleigh, N. C., on the brief), for appellant.

Edward J. Fruchtman, of Washington, D. C., Atty., U. S. Department of Labor (Warner W. Gardner, Sol., and Mortimer B. Wolf, Asst. Sol., both of Washington, D. C., D. Lacy McBryde, Regional Atty., of Raleigh, N. C., and John J. Babe, of Washington, D. C., Atty., U. S. Department of Labor, on the brief), for appellee.

Before PARKER and SOPER, Circuit Judges, and WARING, District Judge.

SOPER, Circuit Judge.

At the suit of the Administrator of the Wage and Hour Division of the United States Department of Labor, the District Court found that the Hamlet Ice Company had failed in the course of its business to abide by the wage, hour and record keeping provisions of the Fair Labor Standards Act of 1938, 52 Stat. 1060, §§ 6, 7 and 11(c), 29 U.S.C.A. §§ 206, 207 and 211(c), and had violated the prohibitions of the Act which require conformity with these standards, §§ 15(a) (1), 15 (a) (2) and 15(a) (5), 29 U.S.C.A. §§ 215(a) (1), 215(a) (2) and 215 (a) (5). Sections 6 and 7 impose certain requirements upon employers as to the wages and hours of employees who are "engaged in commerce or in the production of goods for commerce", and Section 11 requires the keeping and preservation of records of employees so engaged. Sections 15(a) (1), 15(a) (2) and 15(a) (5) make it unlawful for any person to ship, deliver or sell in commerce, or to ship or deliver or sell, with knowledge that shipment or delivery or sale thereof in commerce is intended, any goods produced by persons in violation of the wage and hour provisions of the Act, or to violate any of the provisions in regard to the making and preser-

vation of records. Upon the findings so made, the District Court entered an injunction enjoining the Ice Company from further violation of the Act, and the Ice Company appealed.

The Ice Company admitted non-compliance with the Act, but contended that its activities did not come within the scope of the Act, since its employees were not persons "engaged in commerce or in the production of goods for commerce" to whom the wage and hour provisions of the Act apply. That contention presents the only question to be considered on this appeal.

The Ice Company manufactures substantial quantities of ice throughout the year at its plant at Hamlet, North Carolina, a divisional point on the Seaboard Air Line Railway, which is the only railroad through the town. The manufacturing plant and sales office of the Ice Company is two and a half miles north of the town in which it also maintains a station for local sales. The employees at the plant include persons who operate and maintain the ice producing machinery and who put ice into and withdraw it from storage. About 75 per cent of the output is sold to three interstate carriers by rail, that is, Fruit Growers' Express Company, Seaboard Air Line Railway Company and the Railway Express Agency. The rest of the ice is sold from the station in the town to persons who consume it in North Carolina. The employees at that station are not involved in this case.

Fruit Growers receives deliveries of ice almost daily, which amounted in the aggregate to about 41.5 per cent of the ice sold in the two year period from October 24, 1938 to October 24, 1940. Delivery is made in 300 pound blocks by means of a chute owned by Fruit Growers which extends across the railroad tracks from the Ice Company's platform to the loading platform of Fruit Growers, where the blocks are broken up into suitable sizes by Fruit Growers' employees and loaded by them into the bunkers of refrigerator cars spotted on tracks between the two plants. Delivery is completed by the Ice Company when the ice falls into the Fruit Growers' chute, and all of the handling of the ice thereafter is done by the latter's employees. The refrigerator cars are owned by Fruit Growers or by other refrigerator car lines, and the icing of the cars is done by Fruit Growers under a contract with the Seaboard Air Line. Fruit Growers has no contractual relation with the shippers or consignees of the perishable commodities transported in the cars, but serves only the Seaboard Air Line. The ice is consumed during the course of the transportation of the cars, 90 per cent of which move out of North Carolina and are next iced at points outside of the State.

Seaboard Air Line Railway Company is a common carrier of passengers and freight, moving in intrastate and interstate commerce. It maintains at Hamlet a passenger station, freight yard, repair shops and divisional and other offices. During the two year period the Ice Company delivered to it 25.38 per cent of the ice sold at the plant. The ice is delivered to the passenger station of the Seaboard at Hamlet in trucks operated by the Ice Company's employees. After delivery the ice is broken into suitable sizes by employees of the Railroad Company. Part of it is consumed locally but 90 per cent of it is used to ice foods and beverages in railway dining cars, Pullmans, coaches and mail cars. Practically all of these cars move to extrastate points and are next re-iced, if at all, in other states.

Railway Express Agency is a common carrier of express by rail in intrastate and interstate commerce. It carries on its business in connection with the Seaboard Air Line. It maintains and operates an office and place of business in the Seaboard passenger station at Hamlet. During the two year period 8.4 per cent of the Ice Company's total sales and deliveries were made to it. All the ice purchased by the Railway Express Agency from the Ice Company is delivered by the Ice Company at its plant, and transported in trucks of the Railway Express to its office at Hamlet. The ice is used by the Railway Express for the purpose of icing less than car load express shipments of perishable commodities in transit on express cars in passenger trains of the Seaboard. The Railway Express Agency breaks the blocks into suitable sizes for this purpose. Ninety per cent of all the cars iced by the Railway Express move out of North Carolina and are next iced at points outside of the state.

Hamlet is the main junction point for Seaboard and is its second largest icing station in the Carolinas. It is common knowledge in the community that the cars iced at Hamlet are for the most part through freights, moving between Florida and New York. The Ice Company has knowledge at the time the ice is produced that it will move in interstate commerce.

The contention of the appellant upon this state of facts is that its activities are entirely outside the scope of the Act. Commerce is defined by § 3(b) of the Act to mean "trade, commerce, transportation, transmission, or communication among the several States or from any State to any place outside thereof". The Ice Company does not ship outside the State of North Carolina any of the ice manufactured by it, but sells and delivers it all to common carriers within the state, and so it is said that there is no interstate commerce on its part. All of the ice goes into the hands of ultimate consumers within the state, and the only transportation in interstate commerce occurs while the ice is being used by them in the operation of the trains. This transportation, it is said, is beside the point because goods after their delivery into the actual physical possession of the ultimate consumer are excepted from the definition of goods in § 3(i) of the Act.

The case is analogous, it is said, to cases under the Federal Trade Commission Act where it has been held that the Commission has no jurisdiction over local intrastate sales and deliveries even though the goods may be subsequently shipped or used by the purchasers in interstate commerce, or may come into competition with interstate shipments and thereby affect interstate commerce. Thus in Winslow v. Federal Trade Commission, 4 Cir., 277 F. 206, large sales of goods by a ship chandler to ships lying within the State of Virginia were held to be beyond the jurisdiction of the Commission, although the supplies were to be subsequently used in large part in the navigation of the vessels in interstate movements; and in Federal Trade Commission v. Bunte Bros., 312 U.S. 349, 61 S.Ct. 580, 85 L.Ed. 881, jurisdiction was denied to the Commission to prohibit improper competitive practices by a candy manufacturer, who confined his sales to the state of manufacture, but secured an unfair advantage over out-of-the-state competitors. See, also, Bunte Bros. v. Federal Trade Commission, 7 Cir., 110 F.2d 412; Bunte Bros. v. Federal Trade Commission, 7 Cir., 104 F.2d 996. Cf. California Rice Industry v. Federal Trade Commission, 9 Cir., 102 F.2d 716.

In these cases the mere fact that the practices under consideration manifestly affected interstate commerce was held to be insufficient. It is contended that the Fair Labor Standards Act should be similarly construed, and that like the Federal Trade Commission Act, 15 U.S.C.A. § 41 et seq., it contains no provision expressly covering transactions which merely affect interstate commerce. During the consideration of the latter act by Congress a Conference Committee eliminated a House amendment which provided for minimum wages and maximum hours "in any industry affecting commerce". See Conference Report No. 2738, June 11, 1938, C.C.H. Labor Law Service, paragraphs 4121 and 4123; Jewel Tea Co. v. Williams, 10 Cir., 118 F.2d 202, 206; and this circumstance is likened to the unsuccessful attempt of the Federal Trade Commission in 1935 to secure an express grant of authority over transactions affecting commerce. See Federal Trade Commission v. Bunte Bros., 312 U.S. 349, 352, 61 S.Ct. 580, 85 L.Ed. 881.

The argument is further supported by reference to cases upholding the power of a State to tax sales of commodities or activities in local intrastate business, although they have an effect upon interstate commerce, e. g., Eastern Air Transport v. South Carolina Tax Comm., 285 U.S. 147, 52 S.Ct. 340, 76 L.Ed. 673; Puget Sound Stevedoring Co. v. State Tax Comm., 302 U.S. 90, 58 S.Ct. 72, 82 L.Ed. 68; and by cases under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq., limiting the act to employers engaged in transportation in interstate commerce, and excluding employers engaged in the manufacture of goods intended for such transportation, e. g., Southern R. Co. v. Pitchford, 4 Cir., 253 F. 736; Delaware, L. & W. R. Co. v. Yurkonis, 238 U.S. 439, 35 S.Ct. 902, 59 L.Ed. 1397.

The greater part of this argument is answered by the decision in United States v. Darby, 312 U.S. 100, 657, 61 S.Ct. 451, 85 L.Ed. 609, 132 A.L.R. 1430. It was there shown that the motive and purpose of the Act were to prevent the shipment in interstate commerce of commodities produced under labor conditions below the required standards, and thereby to eliminate injurious competition in the distribution of the goods through the instrumentalities of interstate commerce. The two principal questions considered were whether Congress had power to prohibit the shipment of the proscribed goods in interstate commerce, and also the power to prohibit the production of such goods for interstate commerce. The authority of the federal government over interstate commerce under the Commerce Clause, Const. art. 1, § 8, cl. 3, was declared to be no different in

character or extent from that retained by the States over intrastate commerce, and it was held that while the manufacture of goods is not interstate commerce, shipment thereof is such commerce, and Congress has plenary power to exclude any article therefrom, subject only to the specific prohibitions of the Constitution. Nothing was found in the Fifth or Tenth Amendments to curtail the authority of Congress to prohibit the shipment of goods proscribed by the Fair Labor Standards Act. Hammer v. Dagenhart, 247 U.S. 251, 38 S.Ct. 529, 62 L.Ed. 1101, 3 A.L.R. 649, Ann.Cas.1918E, 724, which struck down the Child Labor Act, was expressly overruled.

■ The power of Congress to prohibit the production of the proscribed goods *for* commerce was recognized with equal clarity, and it was declared that the power over interstate commerce extends to those intrastate activities which so affect interstate commerce as to make a regulation of them appropriate to the attainment of the legitimate constitutional end. Numerous examples of the exercise of power were listed, amongst them the Sherman Anti-Trust Act, 15 U.S.C.A. §§ 1–7, 15 note, and more recently the National Labor Relations Act, 29 U.S.C.A. § 151 et seq.; National Labor Relations Board v. Jones & Laughlin Steel Co., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352, the Tobacco Inspection Act of 1935, Currin v. Wallace, 306 U.S. 1, 59 S.Ct. 379, 83 L.Ed. 441 and the Agricultural Marketing Agreement Act of 1937, United States v. Rock Royal Co-op., 307 U.S. 533, 59 S.Ct. 993, 83 L.Ed. 1446. The doctrine of Carter v. Carter Coal Co., 298 U.S. 238, 56 S.Ct. 855, 80 L.Ed. 1160, so far as inconsistent with the principles of the cases under the Sherman Act and the National Labor Relations Act, was declared to be limited thereby. The same limitation must now be placed upon the decisions of this court, such as Winslow v. Federal Trade Comm., 4 Cir., 277 F. 206, upon which the appellant in part relies.

■ As to the intent of Congress to include within the scope of the act the particular intrastate activity now under consideration, there is no room for doubt, for as the Supreme Court pointed out in the Darby case, 312 U.S. at page 120, 657, 61 S.Ct. 451, at page 461, 85 L.Ed. 609, 132 A.L.R. 1430, Congress expressly prohibited the production for commerce of the proscribed goods. It is true that there is a factual distinction between the Darby case and the case at bar, for in the former the producer manufactured the goods with the intent to ship all or part of them itself to extrastate consumers, while the appellant in the pending case manufactures the goods for shipment only by the carriers. The Supreme Court had no occasion to define the precise limits of the phrase "production for commerce", but there can be no doubt that it relates to all goods that are expected to be transported in interstate commerce whether they are to be shipped by the maker or by some one else. This follows, we think, not only from the broad general purpose of the Act to protect interstate commerce from injurious competition, but also from the language of § 15(a)(1) of the Act which comprehends any goods shipped or delivered or sold "with knowledge that shipment or delivery or sale thereof in commerce is intended". In view of this express provision, it is idle to compare the interpretation of the Federal Trade Commission Act or other statutes in which no express reference to intrastate activities is found. Indeed it is well to bear in mind the admonition in Federal Trade Commission v. Bunte Bros., 312 U.S. 349, 353, 61 S.Ct. 580, 582, 85 L.Ed. 881, that "translation of an implication drawn from the special aspects of one statute to a totally different statute is treacherous business".

■ Whatever remains of the appellant's argument on this branch of the case is met by other recent decisions of the Supreme Court. The fact that the appellant's goods are sold and delivered within the State of North Carolina becomes unimportant in view of the rulings that the incidents of the passage of title do not fix the limits of federal regulation under the Commerce Clause. Santa Cruz Fruit Packing Co. v. National Labor Relations Board, 303 U.S. 453, 463, 58 S.Ct. 656, 82 L.Ed. 954; Illinois Natural Gas Co. v. Central Illinois Pub. Serv. Co., 62 S.Ct. 384, 86 L.Ed. ——; Currin v. Wallace, 306 U.S. 1, 59 S.Ct. 379, 83 L.Ed. 441; Mulford v. Smith, 307 U.S. 38, 59 S.Ct. 648, 83 L.Ed. 1092; National Labor Relations Board v. Fainblatt, 306 U.S. 601, 307 U.S. 609, 59 S.Ct. 668, 83 L.Ed. 1014. Nor are they circumscribed by the domain of permissible state taxation on articles intended to move in interstate commerce; McGoldrick v. Berwind-White Coal Mining Co., 309 U.S. 33, 60 S.Ct. 388, 84 L.Ed. 565, 128 A.L.R. 876; Santa Cruz Fruit Packing Co. v.

National Labor Relations Board, 303 U.S. 453, 58 S.Ct. 656, 82 L.Ed. 954; Southern Pac. Co. v. Gallagher, 306 U.S. 167, 59 S.Ct. 389, 83 L.Ed. 586. It may be added that the limitation of the Federal Employers' Liability Act to employers engaged in transportation shows the inapplicability of cases construing that Act to questions arising under the Fair Labor Standards Act in which commerce includes trade and commerce among the states as well as transportation.

■■■ The decisions under the Fair Labor Standards Act, in harmony with the trend of these authorities, give a liberal interpretation to the provisions of the statute. Thus, in Warren-Bradshaw Drilling Co. v. Hall, 5 Cir., 124 F.2d 42, it was held that the statute applied to the employees of an oil drilling contractor engaged in the production of oil within the state, although their employer had no ownership in the oil and it was sold by other persons to pipe lines within the state for transportation to points outside the state. See, also, Enterprise Box Co. v. Fleming, Adm'r, 5 Cir., 125 F.2d 897; Fleming v. Arsenal Bldg. Corp., 2 Cir., 125 F.2d 278, certiorari granted March 2, 1942, 62 S.Ct. 801, 86 L.Ed. ——. Cf. Jewel Tea Co. v. Williams, 10 Cir., 118 F.2d 202, where it was held that the Act does not apply to salesmen of a wholesaler engaged in distributing extrastate goods exclusively within the state. We conclude that there is no merit in the contention that the employees of the Ice Company were not covered by the Act because their activities were intrastate, and had only an indirect effect on interstate commerce.

■■■ The appellant makes no point that any of its employees are not engaged in the production as distinguished from the sale of ice. The definition of "produced" in § 3(j) includes "handled, or in any other manner worked on", and an employee is deemed to have been engaged in the production of goods if he was employed in "handling, transporting, or in any other manner working on such goods, or in any process or occupation necessary to the production thereof." However, if it be supposed that any of the employees in the case at bar are engaged in the sale as distinguished from the production of the ice, they are likewise engaged in "commerce" within the meaning of the Act. It is conceded that the ice was bought for shipment to other states, and it is well settled that

sales under these circumstances constitute part of interstate commerce. As was said in Currin v. Wallace, 306 U.S. 1, 10, 59 S.Ct. 379, 384, 83 L.Ed. 441: "So far as the sales are for shipment to other States or to foreign countries, it is idle to contend that they are not sales in interstate or foreign commerce and subject to congressional regulation. Where goods are purchased in one State for transportation to another the commerce includes the purchase quite as much as it does the transportation". See, also, United States v. Rock Royal Co-op., 307 U.S. 533, 568, 59 S.Ct. 993, 83 L.Ed. 1446.

The appellant claims in addition that its activities are outside the statutory scheme on the particular ground that all the goods it produces are delivered to the ultimate consumer and are therefore excluded by the definition of goods set out in § 3(i) of the Act. This section provides:

" 'Goods' means goods (including ships and marine equipment), wares, products, commodities, merchandise, or articles or subjects of commerce of any character, or any part or ingredient thereof, but does not include goods after their delivery into the actual physical possession of the ultimate consumer thereof other than a producer, manufacturer, or processor thereof."

■■■ The contention is that the word "goods" is subject to the exception wherever it occurs in the Act, and therefore the Ice Company produces nothing and sells nothing within the intendment of the Act. We do not think this argument is sound. It disregards the precise terms of the section that the goods excluded are not those in the possession of the maker but "goods after their delivery into the actual physical possession of the ultimate consumer". Goods in the course of production are therefore not expressly excluded and exclusion, we think, should not be implied. The goods under consideration in this case were not merely the subjects of commerce; they enter into the very means of transportation by which the burdens of traffic are borne; and to exempt the producer would run contrary to the manifest purpose of the Act to eliminate all sub-standard labor conditions that affect interstate commerce. It seems clear that the exclusion clause was intended to apply only to goods which, having come into the hands of the ultimate consumer, have been withdrawn from further traffic and sale, so that interstate transportation of the goods may take place

without responsibility for a prior production in violation of the standards of the Act. This narrow purpose is evidenced by limiting the exclusion to "the ultimate consumer * * * other than a producer, manufacturer, or processor thereof". Whether the carriers of the ice manufactured under sub-standard conditions in this case are also subject to the Act, raises a different question that is not before us. That would require us to decide whether the exception was intended to cover goods which are used or consumed in aid of transportation, and whether in any event a carrier who breaks up and handles the goods for shipment is a producer or processor of goods under the definition of the word "produced" in § 3(j) to mean "handled, or in any other manner worked on in any State". For decisions in similar cases see Fleming v. Atlantic Co., D.C., 40 F.Supp. 654, 662; Gordon v. Paducah Ice Mfg. Co., D.C., 41 F.Supp. 980, 986; Fleming v. Hitchcock, D.C., 38 F.Supp. 358; contra, Chapman v. Home Ice Co., D.C., 43 F.Supp. 424.

The judgment of the District court is affirmed.