## COLLINS et al. v. KIDD et al.

### No. 26.

District Court, E. D. Texas, Texarkana Division.

May 1, 1941.

Hodges, Levee & Newberry, of Texarkana, Tex., for plaintiffs.

William V. Brown, of Texarkana, Tex., for defendants.

Gerard D. Reilly, Solicitor of Labor, Irving J. Levy, Associate Solicitor, both of Washington, D. C., and Llewellyn B. Duke, Regional Atty., and Harry Campbell, Asst. Atty., U. S. Dept. of Labor, both of Dallas, Tex., for Philip B. Fleming, amicus curiae.

DAVIDSON, District Judge.

This is a suit by the complainants under the Wage and Hour Law, commonly known as the Fair Labor Standards Act, § 1 et seq., 29 U.S.C.A. § 201 et seq. The defendants, Earl Kidd and others, unincorporated, doing business under the name of Kidd Dairy & Ice Company, operate a small, independent ice plant in the City of Texarkana, Texas. The complainants, Norman Collins and others, were employees of the said defendants. It is charged that the defendants are engaged in interstate commerce, and as such come within the provisions of the Act.

The defendants deny that they are engaged in interstate commerce, and further insist that as a retail establishment they are exempt from the provisions of the Act.

Section 6 (Section 206, Title 29, U.S. C.A.) of the Fair Labor Standards Act provides, in part: "Every employer shall pay to each of his employees who is' engaged in commerce or in the production of goods for commerce wages at the following rates," etc.

Section 7 (Section 207, Title 29, U.S. C.A.) of the Act provides: "No employer shall, except as otherwise provided in this Act [section], employ any of his employees who is engaged in commerce or in the production of goods for commerce" (setting forth the minimum hour schedule).

Just what acts of a defendant constitute interstate commerce has been the subject of much adjudication. Someone lately undertook to classify them into three groups:

(a) Those in which the employer or operator is clearly engaged in carrying on a business in interstate commerce.

(b) Where the business has been so integrated upon a national basis, with raw materials coming in and manufactured parts going out of the state, that it creates a flow of commercial articles into and out of the state.

(c) Where the nature of the business has a direct and adverse impact, so as to obstruct the flow and operation of interstate commerce.

The testimony in the case before us shows that the defendants carried on an ice business at Texarkana, the city of Texarkana being situated on both sides of

the Texas-Arkansas line; that their place of business was in Texas, about one mile from the line; that they maintained and serviced some 42 ice boxes two or three of which were on the Arkansas side and the remainder on the Texas side of the city; that they maintained several ice wagons retailing ice, some 75 to 90% of their sales being in Texas, the remainder in Arkansas. Defendants did not cater to wholesale trade, nearly all of their sales being retail, direct to the consumer. They made no effort to ship ice to other localities. Were the defendants, within the purview of the Fair Labor Standards Act, engaged in interstate commerce?

In his message to Congress proposing this Fair Labor Standards Act, the President of the United States outlined the purpose of the law: "As we move resolutely to extend the frontier of social progress, we must be guided by practical reason and not by barren formulae. We must ever bear in mind that our object is to improve and not to impair the standard of living of those now undernourished, poorly clad, and ill-housed."

In the recent case of Goldberg v. Worman, D.C., 37 F.Supp. 778, 779, it was said that "Congress did not intend to extend its regulatory powers to * * * ·incidental and negligible transactions."

In the case of National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 624, 81 L.Ed. 893, 108 A.L.R. 1352, the law is summarized as it has been understood and repeatedly set forth by the United States Supreme Court in the following language: "This power [to regulate commerce] must be considered in the light of our dual system of government and may not be extended so as to embrace effects upon interstate commerce so indirect and remote that to embrace them, in view of our complex society, would effectually obliterate the distinction between what is national and what is local and create a completely centralized government."

■ It is clear, under the facts, that the defendants Kidd and others, living in a border line town between two states, were selling some of their products in that portion of the city across the state line. We do not think that this comes within the purview of interstate commerce contemplated by the Constitution of the United States. To do so would make every retail dealer in every border line town subject to the national rules governing interstate commerce, which was manifestly not the purpose of the Constitution or the intent of any statutory enactment upon such subject.

If we should grant, however, that the defendant, as a factory operator, is engaged in interstate commerce, or that his employees are so engaged, then the important question arises, does he come within the exemption?

Section 13 of the Act (Section 213, Title 29, U.S.C.A.) sets forth those who are exempt from the terms of the Act, as follows:

"(2) Any employee engaged in any retail or service establishment the greater part of whose selling or servicing is in intrastate commerce;

\* \* \* \* \*

"(6) Any employee employed in agriculture;

\* \* \* \* \*

"(8) Any employee employed in connection with the publication of any weekly or semiweekly newspaper with a circulation of less than three thousand the major part of which circulation is within the county where printed and published."

■ The rule is well recognized that statutes, where there ·is no ambiguity and the language is plain and intelligible, must be construed as they are written. It therefore follows that if the defendants were, within the meaning of this exemption, a retail establishment, and the greater part of their sales or service were in intrastate commerce, then they are exempt from the provisions of the Act.

The defendant Earl Kidd, being called by the complainants, testified that 75 to 90% of his sales were made in the State of Texas. His testimony on this point is not controverted. Defendants would therefore appear to come clearly within the exemption.

Treating this exemption article with reference to scope and applicability, among the bulletins issued setting forth the rulings of the department, Wage-Hour Division, we find, under the heading "retail establishment" the following, as set forth in the defendants' brief: "24. In determining whether the greater part of the selling or servicing of a given enterprise is in intrastate commerce (i. e., more than 50 per cent of the servicing or selling) two factors

should be chiefly considered: (1) The number of sales made within the state in which the establishment is located as compared with the total number of sales of the establishment; (2) The gross income derived from sales made or services performed within the State as compared with the total gross income of the establishment. If an establishment falls properly within the classification of 'service or retail establishment' it is immaterial whether such establishment received all its merchandise from, or did all its financing in, a state other than that in which it is located."

■ In Wood v. Central Sand & Gravel Company, D.C., 33 F.Supp. 40, 46, cited by both parties, the Court was, we think, correct in holding: "Whether Section 13(a) (2) [29 U.S.C.A. § 213(a) (2)] applies must be determined, in each case, upon all the facts shown in the record. Certain common-sense considerations, however, are appropriately applied as criteria in all cases."

■ In construing statutes, it is the duty of the Court to endeavor to ascertain the intention and policy of Congress in their enactment, and to make practical application of that intention to the facts in the case. A particular construction must not produce inequality and injustice if another and more reasonable interpretation is possible. Knowlton v. Moore, 178 U.S. 41, 20 S.Ct. 747, 44 L.Ed. 969; Grier v. Kennan, 8 Cir., 64 F.2d 605.

■ As a remedial statute, aimed at bettering the status of labor, in the interest of humanity, this and like statutes are entitled to a liberal construction. However, where the given statute carries with it a severe penalty, we are confronted with that long standing and well recognized interpretation that penal provisions of the law must be strictly construed. United States v. Stowell, 133 U.S. 1, 10 S.Ct. 244, 33 L.Ed. 555; Guardian Trust & Deposit Co. v. Fisher, 200 U.S. 57, 26 S.Ct. 186, 50 L.Ed. 367.

■ Where a statute is both penal and remedial, as where it is penal in one part and remedial in the other, it should be considered as a penal statute when it is sought to enforce the penalty, and as a remedial statute when it is sought to enforce the remedy. Grier v. Kansas City, C. C. & St. J. R. Co., 286 Mo. 523, 228 S.W. 454; Kansas City, C. C. & St. J.

R. Co. v. Grier, 258 U.S. 610, 42 S.Ct. 382, 66 L.Ed. 789.

The decisions of the Supreme Court of Texas in this respect are at least persuasive: "No construction should be adopted which rests on the assumption that the legislature intended to do an unfair, unjust, or unreasonable thing." 39 Tex.Jur. 225; Crim v. Austin, Tex.Com. App., 6 S.W.2d 348; State v. Hogg, 123 Tex. 568, 70 S.W.2d 699, 72 S.W.2d 593.

■ An enactment of a remedial or curative nature is regarded as wholesome and will be accorded liberal construction, "But a statute may be remedial from one standpoint and penal from another. In such a case it will be applied with at least some degree of strictness as to matters beyond its immediate scope and object, and nothing will be added by inference or intendment." 39 Tex.Jur. 274; Railroad Comm. v. Texas & N. O. R. Co., Tex.Civ. App., 42 S.W.2d 1091.

■ It is not questioned that the defendants were operating a retail business. It is further conceded that if they were buying their ice and reselling it, they would be within the exemption. The mere fact that they make their ice instead of buying it we think does not take defendants from under the exemption. If Kidd should sell his ice plant, then contract for the output and retail it, he would manifestly be exempt. Thus if Kidd "A", the factory, deals with Kidd "B", the retailer, then the retailer would be exempt. But since Kidd the manufacturer and Kidd the retailer is one and the same person, then is he not still exempt? We think to hold otherwise would be a strained construction.

It was likewise determined by Congress that there were certain industries that could not be brought within the provisions of the Act, therefore Section 213 was enacted which exempted retailers, farmers, and others. For instance, why should agriculture be exempted? The answer readily comes that the returns from agriculture are not sufficient to enable the farmer or land operator to pay the required standard of wages. Farmer "X", who listened to one of these trials, in his farmerlike manner expressed himself about the Act of Congress thusly:

"Yes, we farmers are exempt." As he looked at his plow he said further: "I work 84 hours a week, but the man who

made my plow must not work over 42 hours a week. I have been buying plows a long time. During that time the cost of this plow has been upped 300 percent, but the price of my corn and cotton is just the same.

"My hired man works 90 hours a week. The man who made his ax must not work over 40 hours a week. The ax has cost me 200 percent above what it cost me when I began to farm; I pay my hired man $20 a month, just like I did when I started.

"My son used to help me on the farm. He is now in the army. The man that makes his powder and shells gets a dollar an hour; my son gets a dollar a day. Now, sir, you can understand why our children leave the farm for the city. We had to be exempt, else I could not hire that hand. If we were not exempt, this would not continue to be a land of plenty, but food would up in price 300 percent just like the cost of my plow has. Then folks would be hungry, you see! We buy from tariff-protected industries operated by wage-protected labor. We sell our cotton in a world market in competition with the peons of India and Egypt. Yes, sir, there are those who pity us here in the South because of our cheap standard of living, but they blindly feed upon our substance and never stop to think that the cry of Famine would overtake Luxury and Plenty if this plow should stop for one brief season. That may be all right, sir, but is it just?"

The man was not a bolshevist. He was proud of his soldier son and, like Israel Putnam of old, would drop his plow in the field and seize his musket if his country called.

██ It is a matter of common knowledge that the returns of the small, retail establishment, like that of agriculture, are very meager. It is a matter of common knowledge that the vast majority of them fail and go out of business. There is so little left that they liquidate without even the expense of bankruptcy. Since, therefore, it was not feasible to include agriculture and the retail dealer in the purview of the Act, we discover the reason for that exemption, and that reason is that the business wouldn't stand the added expense of the higher standard.

We do not have to play upon our imaginations to see the effect if they were included. Practically every retail clerk and farm operative would immediately be discharged and out of employment. The amount of production from agriculture would so shrink and dwindle that prices would soar and the cost of living would become so great that even the benefits of the Act would be lost to industry.

It is not the purpose of this decision to say that our legislature should put the agricultural laborer in one group and the industrial laborer in another, but it does not take a very deep scrutiny to see why it was necessary to separate them in these groups. There is no way of rendering a law unpopular and causing it to be repealed or modified so readily as to extend its purpose beyond the scope of those to whom it was originally intended to apply. To make a law unreasonable is to make it unpopular, and to make it unpopular is to destroy it. In the very interest of those concerned with the preservation and development of the Fair Labor Standards Act, we can see but one solution, and that is to hold that retailers and agricultural employees and others mentioned in the exemptions must be exempt as the Act so provides.

Furthermore, we might look into the evidence as to the source of labor and the compensation of those who were employed in this case. The complainant, Norman Collins, testified in effect that when he started to work for the defendant he was drawing $7 a week; that when he quit working for the defendant he was drawing $14 a week; that now he had gone back to work on the farm and was drawing about $11.20 a month, working 80 hours per month. The complainant Ed Sins was a man weighing far above 200 pounds and more than 64 years of age. Under the schedule of the Fair Labor Standards Act he would be unemployable. During the summer months he was earning about 80 cents a day peddling ice, but this stopped as the weather got cooler and he was then entirely without employment. The defendant Kidd operated a small lunch counter at which his employees ate. The plaintiff, Ed Sins, by acquiescence and permission of the defendant, came to this lunch counter, along with the defendants' employees. This complainant impressed the Court as a man who would prefer to earn his bread than to live upon the charity of the public. At any rate he began to make himself useful and to do anything that he saw needed to be done. There was never any trade or contract by which he was em-

ployed. At the end of the week he was given a dollar, and he appeared on the payroll at $1 per week. In the spring of the year he was given $3.50 per week, and then later $5 per week. In addition to these amounts, he received his board. Under the wording and definition of the Act, he may have been an employee. Under the common law he may have been employed under an implied contract, but likewise the implication might arise that he was permitted to work and draw small pay by reason of the good will and kindly feelings of the defendant Kidd toward him. He testified that when he went to the plant and took the $1 a week, he bettered his condition. At present he is unemployed.

To make the Act workable, it was, at present at least, necessary to insert exemption 213. Under the plain wording of the law defendants are exempt. To hold that they are not exempt because they make and do not buy the commodity they retail would be a strained construction. And, moreover, it not only would be penalizing one who sought advice of counsel and who in good faith believed himself within the law, but it would, in part at least, levy a penalty in return for acts of kindness to one ordinarily out of employment.

Aside, however, from sentiment and from all moral questions of right and wrong, we think that Section 213 is clear and unambiguous and that it includes the defendants within those whom the Congress thought should be exempt from the operation of the law. Judgment will be rendered accordingly.