COUCH *v.* WARD.

4-6978                                                           168 S. W. 2d 822

Opinion delivered February 15, 1943.

*Jameson & Jameson,* for appellant.

*Warner & Warner,* for appellee.

CARTER, J.   Harry Couch, an employee, sued his employers, Mrs. Joe Ward, *et al.,* (who· were partners doing business as Arkansas Ice & Cold Storage Company at Fayetteville, Arkansas), under the Federal *"Fair Labor Standards Act of 1938,"* for back wages alleged to be due him under that act, together with an equal amount for penalty, also for a reasonable attorney's fee and for costs. The trial court directed a verdict for the defendants and, judgment having been entered on such verdict, the employee, Couch, has appealed.

The question here is whether there was substantial evidence to justify a finding that Couch was, within the

meaning of the statute, "engaged in [interstate] commerce or in the production of goods for [interstate] commerce." Before considering the evidence, we set out the applicable provisions of the statute, under which recovery is sought.

Section 6 of the act (Title 29, U. S. Code, § 206) provides, in part: "(a) Every employer shall pay to each of his employees *who is engaged in commerce or in the production of goods for commerce* wages at the following rates—"

Section 7 of the act (Title 29, U. S. Code, § 207) provides in part: "(a) No employer shall, except as otherwise provided in this section, employ any of his employees *who is engaged in commerce or in the production of goods for commerce—*" for longer than a certain time in each week without paying for all excess time at certain rates.

Section 16 of the act (Title 29, U. S. Code, § 216) gives the employee a cause of action, in any court of competent jurisdiction, to recover the amount of unpaid minimum wages or unpaid overtime compensation, and an additional equal amount as liquidated damages and for a reasonable attorney's fee and costs.

Section 3 of the act (Title 29, U. S. Code, § 203) contains the following definitions:

"(b) 'Commerce' means trade, commerce, transportation, transmission, or communication among the several states or from any state to any place outside thereof."

"(i) 'Goods' means goods (including ships and marine equipment), wares, products, commodities, merchandise, or articles or subjects of commerce of any character, or any part or ingredient thereof, but does not include goods after their delivery into the actual physical possession of the ultimate consumer thereof other than a producer, manufacturer, or processor thereof."

The legislative history of the act indicates that the Congress was not attempting to extend its provisions to

the uttermost limits of its power to regulate under the commerce clause. As pointed out in *Kirschbaum Co.* v. *Walling,* 316 U. S. 517 at 522-523, 62 S. Ct. 1116, 86 L. Ed. 1638, the measure, in one of its intermediate stages, was specifically made applicable to intrastate production which merely competed with goods produced in another state. This was deleted in the House, but the measure as it originally passed the House did apply to employers "engaged in commerce in any industry *affecting* commerce." This was not acceptable to the Senate, and the bill as finally passed applied only to employees "engaged in commerce or in the production of goods for commerce." Cases under the National Labor Relations Act illustrate the broad effect of the phrase "affecting commerce"—which phrase the Congress refused to use in the present act.

We also know, *U. S.* v. *Darby,* 312 U. S. 100 at 109, 61 S. Ct. 451, 85 L. Ed. 609, 132 A. L. R. 1430, that one of the main purposes of the act is to prevent the use of interstate commerce as the means of competition in the distribution of goods produced under conditions detrimental to the maintenance of minimum standards of living necessary for health and general well-being, and to prevent the use of such commerce as the means of spreading and perpetuating such substandard labor conditions among the several states. In the same case, 312 U. S. at 115, the court said: "The motive and purpose of the present regulation are plainly to make effective the Congressional conception of public policy that interstate commerce should not be made the instrument of competition *in the distribution* of goods produced under substandard labor conditions, . . ." (Italics are ours.)

We now consider the testimony to determine whether it was sufficient to permit a finding that Couch was "engaged in commerce or in the production of goods for commerce" within the meaning of the act. The employer denied "each and every, all and singularly the allegations contained in the complaint and the amendment thereto."

Couch testified he was employed by the defendants steadily from April 17, 1939, to September 15, 1940, for

twelve hours a day and seven days a week. The defendants operate an ice plant at Fayetteville, Arkansas. Couch was the night engineer, and, except for a few occasions, he was the only employee who worked at night. He operated the machinery, handled the compressor, froze ice, pulled it and put it in the dump room. He sold ice to refrigerator trucks and others who called for it, sold beer, made out sales tickets and collected for them. He pulled about 70 or 80 cakes of ice each night in summer. He operated the machinery that produced ice.

"Q. State, Mr. Couch, whether or not you delivered this ice into refrigerator cars or trucks? A. Trucks; yes, sir."

Some banana trucks came from Louisiana going through to Kansas City. Some cabbage trucks came from Mississippi and Texas. He loaded ice into such trucks. He could not say how many trucks, but judged through the summer season it would run around two a week, but he would not say for sure. Railway refrigerator cars were iced. He could not say how many.

"Q. I will ask you to state whether you also iced railway refrigerator cars? A. I did not put it on the cars."

He sold beer to practically every restaurant in town. Did not sell at retail.

"Q. Where did that beer come from? A. I suppose from Missouri."

The beer came to Fayetteville in railway cars and trucks and was unloaded into the plant where he worked. It was not kept under refrigeration.

As to icing railway cars, he has taken ice out on a chain and got a man to help put it in the cars. "I never did that but once or twice."

This ice made in the plant is sold in Fayetteville and all over the surrounding country. Six or seven trucks operate in summer. It also goes to St. Paul, Arkansas.

Some trucks hauling fruit came to the plant at night and he sold ice to them. All other ice sold, except railway cars and trucks, is sold at Fayetteville and its vicinity, at Winslow, Arkansas, and such places.

The beer received there is sold locally and in the adjacent counties in Arkansas.

The agent of the Frisco Railroad testified that between April 17, 1939, and September 20, 1940, his railroad had purchased ice from this plant for the icing of 55 refrigerator cars, containing commodities shipped in interstate commerce. Total purchases were 116.6 tons of ice. There were two cars of eggs, fifteen of dressed poultry, and thirty-eight of butter.

The manager of the Jerpe Dairy Produce Corporation testified his company rented a cold room at the ice plant during a very short period during summer. Stored only eggs in it—never more than 200 or 300 cases. There was no evidence that any of such eggs were shipped in interstate commerce.

It was shown that the plant sold ice to the Jones Truck Lines and to Lindley (truck line) of Springdale, Arkansas, and to The Arkansas Traveller line. There was no testimony that these lines operated in interstate commerce.

The manager of the ice plant testified that practically all the ice made at the plant was sold at retail in Fayetteville, Arkansas. There are also a few ice houses which buy ice and resell it. From April 15, 1939, to September 15, 1940, the plant sold about 9,000 tons of ice. A very small amount was sold to people coming to the plant, one or two cakes a week. Some was also sold for icing railway cars. In his best judgment the ice sold to trucks for icing commodities would not be over one-twentieth of one per cent. of the total business. Couch did not ice any railway cars. There are three ice stations in Fayetteville to whom the plant sells and they resell. The plant also sells to dealers at Prairie Grove, some at Winslow and some at West Fork. (All are in Arkansas.)

The question for us is: Was there substantial evidence from which the jury could have found that Couch was engaged in interstate commerce or in the production of goods for such commerce, within the meaning of this act?

There was no evidence that Couch was "engaged in [interstate] commerce" within the meaning of this act. "Congress did not choose to exert its power to the full by regulating industries and occupations which affect interstate commerce. . . . A practical test of what 'engaged in interstate commerce' means has been evolved in cases arising under the Federal Employers' Liability Act (45 U. S. C., § 51, *et seq.*) which, before the 1939 amendment (see 53 Stat. 1404), applied only where injury was suffered while the carrier was engaging in interstate or foreign commerce and the injured employee was employed by the carrier 'in such commerce'." See *Overstreet, et al.,* v. *North Shore Corporation,* 318 U. S. 125, 63 S. Ct. 494, 87 L. Ed. ............*, (decided February 1, 1943). Selling ice to an interstate truck or delivering ice to a railroad company for icing cars does not mean that either the employer or employee was engaged interstate commerce within the meaning of this act.

As for the sale of beer, it is not shown that the beer came from out of the state, unless the plaintiffs' statement that it came "I suppose from Missouri" should be held to permit a finding to that effect. But if the beer did come from Missouri, all that plaintiff did was sell a few cases out of the warehouse and this does not mean that he was engaged in interstate commerce. The contrary has been held in *Jax Beer Company* v. *Redfern,* I. Circ., 124 F. 2d 176, and *Swift & Co.* v. *Wilkerson,* 5 Circ., 124 F. 176. When the beer was unloaded at the warehouse its "interstate movement had ended." See *Higgins* v. *Carr Bros. Co.,* 317 U. S. 572, 63 S. Ct. 337, 87 L. Ed. ............*, (decided January 18, 1943), and *Fleming* v. *Jacksonville Paper Co.,* 128 F. 2d 395, affirmed under the name of *Walling* v. *Jacksonville Paper Co.,* 317 U. S. 564, 63 S. Ct. 332, 87 L. Ed. ............*, (decided January 18, 1943). Plaintiffs' sales of beer were confined

---

* Paging not available at time of going to press.

to cafes and restaurants whose supply was exhausted at night and who came to the warehouse to purchase a case or two.

Nor was the plaintiff engaged ''in the production of goods for (interstate) commerce'' within the meaning of the act. He was, of course, engaged in the production of ice, but none of this ice was sold outside of the state nor was it produced for any such purpose. Less than 1.3 per cent. of the total production of the plant was sold to railroads, for icing cars, and to refrigerator trucks. We know that Congress did not choose to exercise its full power to regulate everything that might have even a faint aroma of interstate commerce. As to what was or was not regulated, no mathematical line was drawn. As said in *Gully* v. *First National Bank,* 229 U. S. 105 at 117, 57 S. Ct. 96, 81 L. Ed. 70, quoted with approval in *Kirschbaum Co.* v. *Walling,* 316 U. S. 517 at 526, 62 S. Ct. 1116, 86 L. Ed. 1638, ''What is needed is something of that common sense accommodation of judgment to kaleidoscopic situations which characterizes the law in its treatment of problems of causation.'' And while it may savor of ''the simple and familiar dialectic of suggesting doubtful and extreme cases,'' which has been condemned, we cannot believe that the man who produces waste or lubricating oil which is eventually sold to lubricate the axles of a railway car, or the employees of a local water company which sells water for locomotives, are to be regarded as producing goods for interstate commerce within the meaning of this act. A manufacturer of paint would not be held to be producing goods for interstate commerce solely because he sold 1.3 per cent. of his product to a railroad company and that company used the paint to paint refrigerator cars. To use the language of causation, the connection with interstate commerce is too remote. The most that one can say is that lurking in the background is a question whether the production of such ice may *affect* interstate commerce, just as further in the background there lurks the question whether Congress meant to regulate everything that may even remotely *affect* such commerce, and just as even further in the background there lurks the constitutional ques-

tion whether Congress may destroy our federal form of government by taking charge of all our activities under the commerce clause. In the act before us, Congress meant to stop somewhere short of that end, and we think the stopping point is somewhere short of regulating the production of ice in this small plant, only 1.3 per cent. of whose product is consumed by interstate carriers.

In *Chapman* v. *Home Ice Co.,* 43 F. Supp. 424, a similar case came before Judge Boyd in the District Court for the Western District of Tennessee, and his opinion seems to us to be well reasoned. In that case, 6.79 per cent. of the ice manufactured went to railroads for icing refrigerator cars and for cooling passenger cars, and to shippers for car refrigeration. (In the case at bar, less than 1.3 per cent. of total production goes to railroads and refrigerator trucks.) That court concluded, as we do, that "goods," under the act, means things or commodities which are sent into commerce for trade and traffic in the business world, which will move into commerce, not be consumed by those engaged in such commerce. "There could be no competition in the sale of this ice in other states and no restriction on the free flow of it among the states as it is wholly consumed in its use."

The icing of cars *affects* commerce, but the production of such ice is not production for commerce within the meaning of the act. It is hard to believe that Congress intended to put people into interstate commerce who aid in producing anything at all which railroads consume in their business.

In the case of *Hamlet Ice Company* v. *Fleming,* 127 F. 2d 165, the Circuit Court of Appeals for the 4th Circuit, on different facts, reached a different conclusion. There about 75 per cent. of the output of the plant was sold to three interstate carriers who used most of their purchases to ice interstate shipments. There was a very large icing junction. The opinion in that case turned first on the question of the power of Congress, then upon the question whether it made any difference whether the producers of the goods shipped them in commerce or

someone else did it, and upon whether any importance should be attached to the fact that the goods were sold and delivered by the producer in one state and that the title there passed. That court apparently did not pass upon the question whether the exception in the statutory definition of ''goods,'' excluding goods in the hands of the ultimate consumer ''was intended to cover goods which are used or consumed in aid of transportation,'' which question we think is the vital one here.

In *Goldberg* v. *Worman, et al.,* (D. C. Fla.) 37 F. Supp. 778, and in *Collins* v. *Kidd,* (E. D. Tex.) 38 F. Supp. 634, the courts pointed out that the Congress did not intend in this act to extend its regulatory powers to merely incidental and negligible transactions, and that the regulation therein should not be so extended as to embrace effects upon interstate commerce which were indirect and remote.

In *Whitsell* v. *Enid Ice Co.,* (W. D. Okla.*) 6 Labor Cases No. 61226, where 1.8 per cent. of the total sales of ice were to interstate carriers, the court held such sales too small, under the doctrine of *de minimis non curat lex,* to bring the defendants under the act.

Under our case of *Cunningham* v. *Davis,* 203 Ark. 982, 159 S. W. 2d 751, the burden was on the plaintiff to offer proof that at least a substantial part of the goods be produced were produced for interstate commerce. This he has not done.

In *Walling* v. *Jacksonville Paper Co.,* 317 U. S. 564, 63 S. Ct. 332, 87 L. Ed. ..........., (decided January 18, 1943), the court said: ''. . . We cannot be unmindful that Congress in enacting this statute plainly indicated its purpose to leave local business to the protection of the states. . . . Moreover . . . Congress did not exercise in this act the full scope of the commerce power.''

Furthermore, there was no regularity in the sale of ice to the railroad for icing cars. There was one car iced in April, 1939; two in May; six in June; four in

* No opinion for publication.

318

July; six in August; three in September; five in October; six in November; four in December; one in January, 1940; one in April; five in May; four in June, and six in July. In some instances, two cars were iced in one day. In several months, no ice was sold to the railway. Less than 1.3 per cent of the total production could be said to affect interstate commerce, even remotely. If we are wrong in our finding that none of the ice was goods produced for interstate commerce, there is no substantial evidence that plaintiff was engaged in the production of goods for commerce either during the entire seventeen months period or during any particular work week. He could not have been so engaged during the several months when no car was iced. During the several months when only one car was iced, plaintiff could not have been so engaged for more than one work week and no proof is offered as to which week. A finding that plaintiff was engaged, in producing ice for sale to interstate carriers, during any specific work week would be based on speculation—not on proof.

The only matter alleged as error was the action of the court in directing a verdict for the appellees. This was not error. The judgment is affirmed.