WILLIAM W. FOUNTAIN, W. E. COURTER, OTIS P. EBRECHT, SIDNEY P. WARFORD, FRANK R. McDONALD, JR., ABE F. MALLOY, JACOB F. GERBER, HARVEY McNAIR, GEORGE G. MOORE, B. E. PEABODY, IRA O. GUNSELMAN, CAM U. POWELL, F. W. NAVE, ORIE D. McNAIR, GEORGE WAGNER, JACOB R. GERBER, NEIL S. MARSH, HERBERT A. TAYLOR, MARION FOUNTAIN, CHARLES LEE, BRUCE BOYD, FLOYD F. McDONALD, JAMES R. CREAL, and LEVIT M. KENT, Appellants, v. ST. JOSEPH WATER Co., a Corporation.—No. 38745.—180 S. W. (2d) 28.

Division One, March 6, 1944.

Rehearing Denied, April 3, 1944.

Motion to Transfer to Banc Overruled, May 2, 1944.

818

*Kendall B. Randolph* and *John P. Randolph* for appellants.

*John H. Murdock, Jr., and Culver, Phillip, Kaufmann & Smith* for respondent.

HYDE, J.—This is an action under the Fair Labor Standards Act of 1938 [U. S. C. A., Title 29, Chap. 8, Secs. 201-219] to recover overtime compensation, liquidated damages and attorney's fees. (Sec. 216.) The court found for defendant on the ground "that defendant is a retail or service establishment the greater part of whose selling or servicing is in intrastate commerce within the meaning of Sec. 13(a)(2)" of the Act [29 U. S. C. A. 213 (a) (2)]. Plaintiffs have appealed. Our jurisdiction is invoked because of the amount involved.

The parties agreed upon most of the facts but some evidence was offered by each. Plaintiffs claim that they are entitled to judgment as a matter of law under the facts. Defendant is incorporated under the laws of Missouri, furnishes and sells water only in the counties of Andrew and Buchanan and all of its plants, pipe lines and installations are located therein. Likewise, all of the work of its employees is performed in these counties. It takes water from the Missouri River, pumps it into settling basins where it is filtered, purified and sterilized. The water is then pumped into holding basins from which it flows by gravity into water mains to its customers, mainly in the City of St. Joseph. Defendant's mains are connected with the premises of each customer by a service pipe owned and installed by the owner of the premises. Defendant also furnishes standby fire pressure service, tests and repairs hydrants and valves, and inspects plumbing fixtures of customers. Defendant's rates and business are regulated by the Missouri Public Service Commission.

St. Joseph has about 75,000 inhabitants. It has industries engaged in producing goods for shipment in interstate commerce such as Swift & Co., Armour & Co., Quaker Oats Co., Goetz Brewing Co., Western Dairy and Ice Cream Co., Douglas Candy Co., and others engaged in bottling soft drinks, making vinegar, and manufacturing chemicals. There are also six railroads through the city to which defendant furnishes water. Some of this is used to fill boilers of locomotives and drinking water tanks and other tanks on cars. The city is about seven miles long and three miles wide. Most of defendant's pipe mileage is in the residential sections. During the period involved herein it had from 18,330 to 19,007 total customers. Domestic customers (single private homes) were from 14,535 to 15,106, paying an average of less than $1.50 per month. Commercial customers (including apartment and boarding houses, two or more family homes, churches, hospitals and hotels, as well as wholesale and retail commercial establishments) were

from 3,446 to 3,520, paying an average of less than four dollars per month. Municipal customers (city and county) were 89 to 108, with an additional 120 to 123 fire service customers (not including municipal fire hydrants rented on a different basis) to service fire sprinkler heads, both public and private. Industrial customers were from 103 to 149 and other public utilities from 37 to 38. Industrial and other public utility users consumed 24.6% of the total volume of water and produced 12.4% of defendant's total revenue.

Industrial plants made various use of the water purchased. Swift & Co. had their own wells and about 86% of all water consumed was well water. They preferred to use city water in their canning, curing and processing departments, but "got along at times with entirely all well water." Defendant's water was also used for washing live stock for slaughter and other cleaning purposes. Goetz Brewing Co. used it as an ingredient of its beer as well as for drinking water and cleaning purposes. Quaker Oats Co. used it at one plant only for drinking and cleaning purposes and in another plant as an ingredient in manufactured food products. Bottling companies used it as an ingredient of carbonated beverages. It was used by another company as an ingredient of vinegar. It was likewise used by chemical and pharmacal companies in their products. It was also used to fill boilers in factories using steam power plants.

Plaintiffs' work ranged from repairing mains, hydrants, meters and valves, inspecting plumbing, checking and testing the distribution system, and laying new mains, pipes and meters, to reading meters, collecting delinquent accounts, answering telephone calls and doing janitor or clerical work. Some of them worked on the reservoirs, washing, repairing and breaking ice in them. It was not shown that any one of them had ever directly connected or serviced the appliances through which water immediately flowed into the private water pipes of any industrial or public utility users as a part of his regular work or otherwise.

Plaintiffs say that "their work in producing and distributing usable water to the numerous industries in and around St. Joseph is a 'process or occupation necessary to the production' of 'goods for commerce', as this quoted language is defined and used in Sections 203 and 207". [See definition of "produced" Sec. 203j.] Of course, whether or not water sold by defendant is necessary to the production of other goods would not make any difference if defendant is exempted from the application of the Act under the provisions of Sec. 213. Plaintiffs say that defendant is not a "retail or service establishment" because it is a public utility and if it falls into any other classification it is a manufacturer. Defendant raises no issue as to the form of action, or constitutional grounds, so that the question for our decision is the interpretation and application of provisions of the Act. Thus we are not called upon to consider herein what

Congress could do in this field but only to determine what it has done therein in this Act. The purposes of the Act were discussed, and its constitutionality settled, in United States v. Darby Lumber Co., 312 U. S. 100, 61 S. Ct. 451, 85 L. Ed. 609. It is also settled that "the provisions of the Act expressly make its application dependent upon the character of the employee's activity", rather than upon the general interstate or intrastate nature of the employer's business. [Kirschbaum v. Walling, 316 U. S. 517, 62 S. Ct. 1116, 86 L. Ed. 1638.]

██ The basis of the Act is the Commerce Clause of the Constitution of the United States. However, the United States Supreme Court has called attention to the fact that "Congress did not exercise in this Act the full scope of the commerce power"; that it did not intend that it be "extended to business or transactions 'affecting commerce'" only; and that it "plainly indicated its ██ purpose to leave local business to the protection of the states." [Walling v. Jacksonville Paper Co., 317 U. S. 564, 63 S. Ct. 332, 87 L. Ed. 460; see also Higgins v. Carr Bros. Co., 317 U. S. 572, 63 S. Ct. 337, 87 L. Ed. 468.] The exemption in Sec. 213(a)(2) of "any employee engaged in any retail or service establishment the greater part of whose selling or servicing is in intrastate commerce" (relied upon by the trial court) and that in Sec. 213 (a) (1) of "any employee employed in a bona fide . . . local retailing capacity" as well as other provisions of the Act clearly so indicate. In the Jacksonville Paper Co. case, the Supreme Court said of these exemptions: "It is quite clear that the exemption in Sec. 13(a)(2) was added to eliminate those retailers located near the state lines and making some interstate sales. . . . And the exemption for retailers contained in Sec. 13(a)(1) was to allay the fears of those who felt that a retailer purchasing goods from without the state might otherwise be included." The Supreme Court held therein that employees, of even a wholesaler doing considerable interest business, were not under the Act if their own work was only in the intrastate phases of the business. The same ruling was made by the Supreme Court in the Carr Bros. Co. case. The court reaffirmed the test that "the applicability. of the Act is dependent upon the character of the employee's work." Surely employees engaged in local selling, entirely within one state, of a commodity acquired in that same state, were not intended to be within the Act.

██ We think the trial court was right in holding that these exemptions applied to defendant herein. In White Motor Co. v. Littleton (U. S. C. C. A., 5th Cir.), 124 Fed. 2d 92, the Court said "The word *retail* is not defined by the Act. Given its common and ordinary acceptation when used in sales parlance, it means a sale in small quantity or direct to the consumer, as distinguished from the word *wholesale,* meaning a sale in large quantity to one who intends to resell. *The character of the sale is not altered by the use to which the consumer may put the purchased commodity."* (Our italics.) The

same court in Collins v. Kidd Dairy & Ice Co. (U. S. C. C. A., 5th Cir.), 132 Fed. 2d, 79 said "A retail establishment under Section 13(a)(2) is one that sells goods in small quantities for profit, and a manufacturer engaged primarily in the production of goods does not come within the terms of the exemption." It held, as to the ice company therein involved (selling ice in two states), that "though its business consisted in part of wholesale and retail sales, it was predominantly a manufacturing establishment." We think the distinction applicable here (between an ice manufacturer and a water company) is pointed out in Samuels v. Houston (D. C.), 46 Fed. Supp. 364 (also holding that such an ice company was a manufacturer and therefore not within the exemption of a retail establishment) namely: that "processing incidental to retail selling will not alter the retail character of the business." The court said: "A custom tailor making clothes to order may be engaged in manufacturing while his neighbor, a haberdasher, selling custom-made clothes and altering them to suit the customer may be a retailer. The distinction between incidental processing and actual manufacture is quite real, though often one of degree." Defendant herein sells only water. It certainly does not manufacture this water. It finds it in the Missouri River, pumps it to settling basins and there (at most) merely processes it by filtering, purifying and sterilizing it. When it is sold, it is still the water that came out of the Missouri River even though it has been purified by taking out some foreign substances and sterilized by adding chemical elements. Our conclusion is that defendant is not a manufacturer of water, but is a retailer thereof.

Plaintiffs say that this exemption should not apply to a public utility, citing Schmidt v. Peoples Telephone Union (U. S. C. C. A., 8th Cir.), 138 Fed. 2d 13. However, not only was the telephone company therein involved handling interstate calls, but also as pointed out in that opinion the Act contains a separate exemption for telephone companies with classification according to number of stations. We see nothing in the Act to prevent the exemption from applying to a public utility which is a retail establishment. Defendant is a public utility because it sells a commodity essential to modern municipal existence in which the public has an interest because it is vital to public health and safety, but it, nevertheless, sells it at retail.

Certainly all of defendant's sales are "direct to the consumer" and the bulk of them are in small quantity. None of them are made "to one who intends to resell" ▮ the water, and none of them are made outside this state. In this connection we note that the definition of "goods" (Sec. 203i) specifically provides that it "does not include goods after their delivery into the actual physical possession of the ultimate consumer thereof other than a producer, manufacturer or processor thereof." Certainly the water sold by defendant is delivered "into the actual physical possession of the ultimate con-

sumer'' and is thus consumed by him, even if used in manufacturing foods or beverages with considerable water content. Surely, it could not be reasonably claimed that making beer, vinegar or coca cola (or converting water into steam) is producing, manufacturing or processing water. Such products are not sold as water as defendant sells it. Plaintiff's argue that defendant cannot be a retailer because it does not buy what it sells. However, we think the determining factor here is the character of its selling and not the manner of acquisition of what it sells. [See Great Atlantic & Pacific Tea Co. v. Cream of Wheat. Co. (U. S. C. C. A., 2d Cir.), 227 Fed. 46.] The fact that defendant sells water through the instrumentality of connecting pipes and meters does not prevent defendant's business from being retail. [See Walling v. Sanders (U. S. C. C. A., 6th Cir.), 136 Fed. 2d 78, so holding in case of vending machines; see also White v. Jacobs Pharmacy Co. (D. C.), 47 Fed. Supp. 298 (chain stores); Zehing v. Brown Materials Ltd., 48 Fed. Supp. 740 (sand, gravel and other building materials); see also discussion in Brown v. Minngas Co. (D. C.), 51 Fed. Supp. 363 (Gas Co. which sold gas outside state and did much wholesale business)]. We, therefore, rule that the trial court correctly held defendant to be within the exemption of a retail establishment. (As to defendant being a service establishment, it seems to us that such servicing as it did was only incidental to its main business of selling water.)

Furthermore, whether or not defendant is within this exemption, we think that the activities of its employees in connection with its business of taking, processing and selling water, so far as the evidence discloses them, were too remote from ''the production of goods for commerce'' to bring them within the Act. Employees were much more immediately and directly connected with the production of goods for commerce, in the two cases recently decided by the United States Supreme Court upon which plaintiffs most strongly rely. [Kirschbaum Co. v. Walling, 316 U. S. 517, 62 Sup. Ct. 1116, 86 L. Ed. 1638; Warren-Bradshaw Drilling Co. v. Hall, 317 U. S. 88, 63 S. Ct. 125, 87 L. Ed. 99.] In the Kirschbaum case, they serviced the building in which such goods were produced, even actually transporting such goods (by operating elevators) on their way out of the building into such commerce after they were made, as well as thus bringing in the materials from which they were made. In the Warren-Bradshaw case, they operated the drilling equipment necessary to reach the oil (intended for interstate commerce) and to provide the means by which it could be taken from the ground.

In the Kirschbaum case, the court ruled that each case must be decided upon the specific factual situation involved, saying: ''What is needed is something of that common-sense accommodation of judgment to kaleidoscopic situations which characterizes the law in its treatment of problems of causation.'' This, of course, is the test of

direct or remote connection. The court also applied a rule similar to that developed in determining the application of the Federal Employers' Liability Act, saying: "the work of the employees in these cases, had such a close and immediate tie with the process of production for commerce, . . . was therefore so much an essential part of it, that the employees are to be regarded as engaged in an occupation 'necessary to the production of goods for commerce' ". [See also Overstreet v. North Shore Corp., 318 U. S. 125, 63 S. Ct. 494, 87 L. Ed. 656; McLeod v. Threlkeld, 319 U. S. 491, 63 S. Ct. 1248, 87 L. Ed. 1538; where this test is further considered.] The Court discussed the application of such rules in the Kirschbaum case, as follows: "Because some employees may not be within the Act even though their activities are in an ultimate sense 'necessary' to the production of goods for commerce, it does not follow that no employees whose activities are 'necessary' are entitled to the benefits of the Act. . . . 'Necessary' is colored by the context not only of the terms of this legislation but of its implications in the relation between state and national authority. We cannot, in construing the word 'necessary', escape an inquiry into the relationship of the particular employees to the production of goods for commerce. If the work of the employees has only the most tenuous relation to, and is not in any fitting sense 'necessary' to, the production, it is immaterial that their activities would be substantially the same if the employees worked directly for the producers of goods for commerce."

The Supreme Court of Arkansas in Couch v. Ward, 168 S. W. (2d) 822, recently applied these tests in holding that the Act did not apply to an employee of a small ice plant which sold only 1.3% of its ice to interstate carriers for use in refrigerator cars and trucks. The Court said: "While it may savor of 'the simple and familiar dialectic of suggesting doubtful and extreme cases,' which has been condemned, we cannot believe that the man who produces waste or lubricating oil which is eventually sold to lubricate the axles of a railway car, *or the employees of a local water company which sells water for locomotives, are to be regarded as producing goods for interstate commerce within the meaning of this Act.* A manufacturer of paint would not be held to be producing goods for interstate commerce solely because he sold 1.3% of his product to a railroad company and that company used the paint to paint refrigerator cars. To use the language of causation, the connection with interstate commerce is too remote." (Our italics.) We think that plaintiffs' work here was still more remote from the production of goods for commerce than that shown in the ice cases. The actual ice produced did move in such commerce (to preserve perishable goods during transportation therein) in the final form in which it left the plant. [See Chapman v. Home Ice Co. (U. S. C. C. A., 6th Cir.), 136 Fed. 2d 353, where the Court held the Act applicable to an ice manufacturer

which sold a more substantial portion of its production for such purposes to interstate carriers.] This was not true of the water sold by defendant. It was either completely consumed or used by being mixed into some other products which were not sold as water. In making beer (or vinegar, soft drinks, etc.) it was at least merged into a product which was marketable only because of the ingredients it contained other than water. The water used in railroad engines had to be converted into steam to be of any use in transportation. What portion of defendant's total sales was so used does not appear, but it is evident that it would be very small. Therefore, upon the tests established by the United States Supreme Court, our conclusion is that plaintiffs' connection with the production of goods for commerce was too remote and tenuous to bring them within the Act; and that their work for defendant cannot reasonably be said to be so closely connected with such production as to be practically or essentially a part of it. The judgment is affirmed. All concur.